G. B. VAN ALSTYNE, Plaintiff, v. ROCHESTER TELEPHONE CORPORATION, Defendant.

City Court of Rochester, Civil Branch, February 24, 1937.

*Webster, Lamb & Webster* [*Edward H. Lamb* of counsel], for the plaintiff.

*Hubbell, Taylor, Goodwin, Nixon & Hargrave* [*Frank Goodwin* of counsel], for the defendant.

WILDER, J. The plaintiff sues for damages suffered through the death of his two dogs, alleged to be due to the acts of the defendant.

The plaintiff was the owner of a valuable hunting dog, Nancy. He kept it in an inclosure at the rear of the lot upon which he lived. Within the inclosure or run there was a kennel. At the rear of the lot, the rear of the run, was a concrete pole upon which the defendant, under permit or easement, maintained a lead cable.

On May 4, 1936, the defendant's servants opened the cable by removing the lead for a space. Other work was done on later days. Nancy had been kept in the inclosure off and on for two years. On May eighteenth she showed signs of illness and was taken to Dr. Clarence Webber, a veterinarian. Despite his efforts the dog died on June third. Dr. Webber performed an autopsy and found " metallic poisoning of the lead type."

On June thirtieth the defendant completed its work and sealed the cable and sealed the joint by wiping it with molten lead or solder. Meantime the defendant had purchased another dog, Pooch, which he kept in the inclosure. It, too, became ill on July fifth and was taken to Dr. Webber. He testified that its symptoms were like those of Nancy. Pooch died, and the autopsy also disclosed lead poison. A chemical analysis of the viscera disclosed the lead.

At or shortly before the death of Pooch, the plaintiff made a careful inspection of the inclosure and found three handfuls of small pieces of lead. A quantity of them was introduced in evidence. It appears that some of them were lead parings and that the others were formed by striking the ground after falling in a molten state. Also in evidence was a piece of iron pipe that had lain for a considerable time. Upon it were numerous spatters of lead such as occur from the precipitation of the molten metal. Although the lead was not discovered until after the death of the first dog, Nancy, it is naturally, and, therefore, appropriately, to be inferred that the lead was deposited in the run by the defendant's operations on the cable, and that the dogs died as a result of eating some of that lead. There is no evidence which so much as points to an inconsistent possibility.

May the defendant be held responsible as for negligence in permitting the lead to fall upon the plaintiff's premises? This question is both complex and perplexing. It involves numerous elements which, perhaps, may best be indicated by reference to various passages in the Restatement of the Law of Torts (Vol. 2): To what extent is one charged with knowledge of the operation of natural forces and the habits and capacities of animals? (§§ 290 and 302 and comments.) What is the effect of the fact that the defendant was engaged in the extension or repair of an instrument of public utility? (§§ 291, 292 and 293 and comments.) What of the intervening action of the dogs and was it a dependent or superseding cause? (§§ 437, 441 to 443, inclusive, and comments.)

Generally speaking, was the defendant guilty of negligence at all? Certainly its acts were not essentially or obviously dangerous. Were the setting and surrounding conditions such as to suggest to a person of average prudence and foresight that the acts done or omitted might have the results which ensued? (§§ 283, 284, 435 and comments.) Is a person of average wisdom and experience aware that a dog may be poisoned by lead when introduced by ingestion? Does he know or should he know that a dog would eat such a substance? These are some of the queries that arise in connection with the question whether the results should, in reason, have been foreseen. Reasonable minds might well differ on the foreseeability of the consequences in this case, just as they differed in their opinions upon a kindred question in *Palsgraf* v. *Long Island R. R. Co.* (248 N. Y. 339, at pp. 346, 347).

It cannot be said with assurance that the hazard was more apparent in the present instance than in that case whose prevailing opinion declares that " negligence in the abstract, apart from things related, is not a tort," that " the orbit of danger as disclosed to the eye of reasonable vigilance would be the orbit of duty " (*Palsgraf* v. *Long Island R. R. Co.*, *supra*, at p. 343), and, with respect to holding one to the duty of foreseeing the consequences, that " life will have to be made over, and human nature transformed before prevision so extravagant can be accepted as the norm of conduct, the customary standard to which behaviour must conform." (*Palsgraf* v. *Long Island R. R. Co.*, *supra*, at p. 343.)

I am unable to perceive between the two cases any distinction of sufficient merit to hold the defendant upon the ground of negligence.

There remains, however, the fact that there was an invasion of the plaintiff's premises. True, the defendant had an easement for the maintenance of its line, and presumably this expressly

conferred the right of access to the plaintiff's land for purposes of repairs or extensions. But it is not to be presumed, nor is it shown, that the defendant had an express right to cast unnecessarily, or to leave in any event, articles or substances upon the premises. Lacking such an express right, the law gives him none.

Such an invasion of the premises of another renders the invader liable whether it be intentional or not or whether the loss resulting to the owner be direct or consequential. He is liable regardless of the existence or non-existence of negligence. That is one of the grounds for holding one liable when, for instance by blasting, he casts material upon the land of another to the injury of buildings (*Hay* v. *Cohoes Co.*, 2 N. Y. 159), or to a person rightfully thereon. (*St. Peter* v. *Denison*, 58 N. Y. 416.)

It does not matter that the plaintiff here seeks recovery not for direct damage to his soil or to vegetation or structures, but for consequential damages. Recovery does not depend upon directness of the damage. The test is whether there was a direct invasion. Given that, responsibility follows. (*Atwater* v. *Trustees of Canandaigua*, 124 N. Y. 602; *Huffmire* v. *City of Brooklyn*, 162 id. 584; *Gordon* v. *Ellenville & Kingston R. R. Co.*, 119 App. Div. 797; recognized in *Waterloo Woolen Mfg. Co.* v. *State*, 118 Misc. 516.)

*Radcliff* v. *Mayor of Brooklyn* (4 N. Y. 195) contains what is apparently the original extended exposition of the doctrine in this State. Holding that a municipality is not liable in the absence of negligence or direct trespass, for consequential damage from grading a street, this decision has been cited and followed down through the years. Relative to the right of a man to enjoy or use his own property, the opinion states (at p. 200): " He may set fire to his fallow-ground; and though the fire run into and burn the woodland of his neighbor, no action will lie. * * * He may open and work a coal mine on his own land, though it injure the house which another has built. * * * And he may do the same thing though it cut an underground stream of water which before supplied his neighbor's well." On the other hand, the opinion says (at p. 198): " He may not, however, under color of enjoying his own, set up a nuisance which deprives another of the enjoyment of his property. Nor can he rightfully enter or cast anyth ng on the land of another, unless he have a license from the owner or authority in law for doing the act. And the absence of bad motive will not save him from an action. Thus if one having a hedge on his own land adjoining anothers close cut the thorns, and they fall against his will on his neighbor's land, from which he removes them as soon as possible, he may be treated as a trespasser."

And if, before removal, a thorn should injure the foot of the neighbor's barefoot boy, the invader would be responsible for that as well as for the technical trespass. Likewise, if the projectile from blasting should pass through a neighbor's roof, overturning a stove and firing the building, it would not be seriously urged that the owner, while entitled to recover for the direct injury to the roof could not recover the consequential damage caused by the fire.

The present case is not one of acts committed after a permissive entry (See Restatement of the Law of Torts, vol. 1, § 214 [1]), though even that situation entails liability " where the actor deliberately abuses his privilege by doing an act which he recognizes as unnecessary." (See comment [a] on § 214.) The entry under license was not an invasion. The trespass consisted in the unnecessary deposit of material upon the land in the process of the licensed operation. That is the " unprivileged intrusion " which " makes him liable for any harm caused to any legally protected interest which the possessor has in the land, * * * or to any third person or thing in the security of which the possessor has a legally protected interest, * * * irrespective of whether it was caused by conduct which, were the actor not a trespasser, would have subjected him to liability." (Restatement of The Laws of Torts, vol. 1, § 163 and comment F.) For example, one who has a license to store trucks in another's barn becomes a trespasser when he essays to repair them and in doing so, sets the barn on fire. (Illustration 7 to § 168.)

It follows that the defendant, by depositing lead on the plaintiff's premises became an intruder, and is liable for the consequences regardless of whether the results could or should reasonably have been foreseen, or whether the acts constituted negligence.

After all a rule of law is but the outcome of an effort to give effect to the general sense of right, duty and justice, and expression to the common experience of men n their everyday affairs — no matter how laboriously formulated or with what seemingly technical phrases expressed.

It requires no fine-spun reasoning to hold one responsible for a wrong done another who is without fault. But in a practical world, there must be practical limits. The law says a man in an ordinary situation should not, although in the wrong, be held for consequences which a reasonably attentive and careful man would not foresee. That rule found expression, and it endures, because it accords with the opinion of the average man.

It is a rule of action in the world at large. The immunity which it grants does not accompany the actor when he intrudes upon the property of another. There the owner is supreme. His house is

his castle, and his estate his exclusive domain. There, not all the rules which govern in the world at large apply. No intrusion is so trifling as to be overlooked, and no result of the intrusion is to be without remedy because it was unusual or unexpected.

It does not seem that the average man of affair would favor relieving the intruder from the results of his invasion, upon his plea that he did not or could not foresee the consequences. Rather would he say that the intrusion is at the peril of the intruder, in harmony with the conclusions of the authorities which so declare.

There remains the matter of damages. The plaintiff placed Nancy's value at $500. Mr. Hill, who had hunted over her valued her at from $300 to $350; Mr. Crawford, at $300 to $450. Considering that she was but three years old, had received expensive and valuable training, was very proficient, the sum of $400 would seem a fair and reasonable value.

On the other hand, Pooch, although still better in the field, was twelve years old. While Mr. Hill who raised and trained him, valued him at from $400 to $500, he sold him to the plaintiff in June for $100. However, this was with the understanding that both should use him. It appears that his usefulness as a hunter is nearing the end. The sum of $150 fairly represents his value.

The defendant contends that recovery with reference to Pooch is forbidden by section 114 of the Agriculture and Markets Law that " no action shall be maintained for the possession or value of a dog, or for damages for injury or destruction of a dog not wearing a tag attached to a collar as provided in this article." Pooch had been licensed and bore a tag, issued upon the application of Hill before the sale to the plaintiff. The plaintiff had not applied for another license and tag and stated he did not know it was necessary.

Section 114 deals generally with the seizure of untagged dogs by peace officers and representatives of the commissioner. The owner is given three days to redeem the dog by producing a license and paying a seizure fee; and if he fails to do so, he " shall forfeit all title to the dog and the dog shall be sold or killed " and " in the case of sale, the purchaser * * * must * * * obtain a license for the dog."

It seems plain that the inhibition against recovery of possession or value is confined to instances where there has been a seizure under the section. Relating to " untagged " as distinguished from " unlicensed " dogs, it cannot be intended to exonerate persons who, not being seizing agents take, kill or injure a dog through trespass or negligence. The limit of its effect is to protect an agent against liability for damage caused either in the seizure or while holding the dog for redemption by production of a license.

Furthermore there is no express language in the entire article (7) which required this plaintiff to procure another license and tag. It is the dog which must be licensed, not the owner, as indicated by the recurrent phrase " unlicensed dog." Section 109, relating to the application, does not require it to show the name and address of the owner, but merely " the name, sex, breed, age, color and marking of the dog." It provides that the owner upon transfer of possession and ownership to another, " may " surrender the license and tag to the clerk and the new owner " shall thereupon " file an application for a new license. Contrast this with the provision of section 114, that in case of sale by a seizing officer after failure to redeem, the purchaser " must " pay the purchase price and obtain a license.

This statute clearly does not limit the recovery in this case. In addition to the $550 which is found to be the value of the dogs, the plaintiff expended $19.50 for their treatment, exclusive of autopsies and chemical analyses. Let judgment enter in favor of the plaintiff as follows:

| | |
|---|---:|
| Damages........................................ | $569 50 |
| Court costs...................................... | 4 40 |
| Statute costs.................................... | 20 00 |
| Total........................................ | $593 90 |