Albert A. ARVIDSON, et al.,
Plaintiffs,

v.

REYNOLDS METALS COMPANY, a corporation, Defendant.

W. J. WHITEAKER, et al., Plaintiffs,

v.

REYNOLDS METALS COMPANY, a corporation, Defendant.

Civ. Nos. 1415, 1653.

United States District Court,
W. D. Washington, S. D.

Oct. 19, 1954.

See also D.C., 107 F.Supp. 51.

**482**

Schafer & Cronan, Portland, Or., and Paul M. Reeder, Hillsboro, Or., Eisenhower, Hunter, Ramsdell & Duncan, Tacoma, Wash., for plaintiffs.

King, Miller, Anderson, Nash & Yerke, Portland, Or., Henderson, Carnahan, Thompson & Gordon, Tacoma, Wash., and Walter Rice and W. Tobin Lennon, Richmond, Va., for defendant.

BOLDT, District Judge.

Plaintiffs in the Arvidson case operate fourteen farms in Clark County, Washington. Their complaint filed in December, 1950 seeks damages and injunctive relief against defendant because of alleged damage to lands and cattle claimed to have been caused by fluorides discharged from defendant's aluminum plant at Troutdale, Oregon. The Whiteaker complaint was filed in November, 1952 by plaintiffs operating four farms in Cowlitz County, Washington seeking the same relief under similar allegations relating to the operation of defendant's aluminum plant at Longview, Washington. The cases consolidated for trial involve generally identical questions of law and fact. Seventy five witnesses testified and 342 exhibits were admitted in evidence. The court visited every farm involved, saw many of the cattle and inspected both aluminum plants with particular attention to their fume control systems. Prior to the trial, on motion and after full hearing, the applicable statute of limitations was determined by the court. Extensive briefs on the liability issues, together with a transcript of 2,500 pages, were submitted. Following the argument on liability the court indicated orally and at some length its then view of the controlling facts, reserving final decision on all points for written opinion.

A detailed analysis of the evidence would greatly lengthen this opinion and would not serve any useful purpose. The evidence was closely followed as it was presented, copious notes taken and at the conclusion of the evidence the court made a memorandum summarizing its impression of each witness and the weight and value to be given to his testimony. The facts as now found are based on extended study and consideration of the entire record, which will be summarized largely in general terms.

The Troutdale plant was constructed for the United States in 1941–1942 by Aluminum Company of America and operated by that company from May, 1942 to September, 1945 when operations were shut down. Defendant commenced operation of the plant under a lease in September, 1946 and with various short interruptions has continued the operation ever since. The plant was purchased from the government and deeded to defendant in June, 1950. The Longview plant was constructed by defendant and commenced operation in 1941. With various shutdowns defendant has operated the plant to the present time. In both plants aluminum is produced by processes which unavoidably cause gases, fumes and airborne particulates to be formed, some part of which are discharged into the atmosphere from the plant stacks. The effluence contains fluorides in some form and amount which eventually may

be deposited on lands within a radius of ten miles or more of the plant, but the course, quantity and distribution thereof cannot be directly observed or known. Fluorides of some of the types escaping from the plants, if ingested in excessive quantities, are capable of causing damage to cattle.

Prior to defendant's first operation of the Troutdale plant in 1946 substantial improvements in the fume control system were installed at an expense of nearly $300,000. At the same plant defendant, at a cost of over two million dollars, completed installation in November, 1950 of an elaborate fume control system said to be as advanced and efficient as presently exists in the aluminum industry. From time to time various improvements in the fume control system at the Longview plant have been installed, the latest in 1949. Whether the measures taken by defendant to minimize the escape of fluorides from its plants are the maximum possible consistent with practical operating requirements is yet to be determined, but apparently American industry has not yet developed anything better. The record shows that the United States has a very important interest in the continued operation of these plants for their large scale production of aluminum essential to national defense. Because thereof the government has contractual obligations to defendant concerning claims of the character presented in these cases and for reacquisition of the Troutdale plant in the event operation thereof be enjoined. The conclusions reached by the court as to the facts and law controlling of these particular cases make it unnecessary to decide defendant's contention that because of the commitments referred to the United States is a necessary party in the Arvidson case, but the circumstances just stated indicate the lawful and important character of defendant's operations. For the same reason, consideration of defendant's contentions as to the effect of the releases executed by plaintiffs is not required.

In a number of cases previously heard in this and other courts in this area awards for fluorine damage resulting from operation of the Troutdale and Longview plants have been allowed, but every such case involved periods when little, if any, fume control measures were taken and before the installation of the later of the fume control improvements referred to.

Plaintiffs' farms are located at various distances up to seven miles from defendant's plants. During various periods up to several years prior to the filing of the complaints plaintiffs grazed dairy and beef cattle on their farms. Most of the cattle claimed to have been damaged were on the farms the whole of a two-year period prior to commencement of the actions.

■ Plaintiffs had the burden of establishing by a preponderance of the evidence that the market value of their farms was depreciated and/or that the physical condition and milk producing capacity of their cattle were damaged by fluorides emanating from defendant's plants. Extensive evidence was introduced for such purpose. Defendant's evidence, equally extensive, was to the effect that no depreciation in market value of plaintiffs' farms had occurred and that the maximum possible ingestion of fluorine by plaintiffs' cattle, whether attributable to defendant's plants or otherwise, was well within the amount cattle can take without damage either as to physical condition or milk producing capacity. Plaintiffs' veterinarians testified that plaintiffs' cattle had and were suffering from various conditions ascribed to fluorine; and dairy records purporting to show a loss in milk production were presented. Veterinarians engaged by defendant flatly denied that the physical defects in plaintiffs' cattle were due to fluorine and ascribed them, as well as any apparent decline in milk production, to poor husbandry and other causes and conditions unrelated to fluorine.

The expert testimony, in some instances given by scientists of national

eminence, was in sharp conflict. Plaintiffs' experts testified that damage to plaintiffs' cattle could and did follow from ingestion of fluorine in the quantities shown by forage sampling in the area of plaintiffs' farms. Defendant's experts unequivocally and without reservation testified to the contrary.

All of the plaintiffs testified to personal observations of physical ailments and milk production performance of their cattle. Plaintiffs may have been sincere in believing that all of the ills of their cattle and all of the unsatisfactory conditions in their dairy operations were due to fluorine damage; however, rarely did a plaintiff voluntarily or readily acknowledge any cattle ailment, damage or unsatisfactory condition as being due to any other cause, no matter how apparent it might be. On the whole, the court was not favorably impressed with the personal testimony of plaintiffs. Almost every plaintiff on cross examination was badly discredited in various respects but primarily by (a) testimony at the trial directly contrary to testimony given by pretrial deposition; (b) reluctant admission of conditions and causes unrelated to fluorine accounting in many instances for the damage or condition complained of; (c) admission of substantial increases in income from dairy products during the years complained of as contrasted to earlier periods when fluoride effluence was as much or greater; and (d) the testimony of some plaintiffs in the Arvidson case that no injurious effects or damage were observed from 1942 to 1945 during the period Alcoa was operating the Troutdale plant without the fume control improvements installed by defendant when fluoride effluence must have been very much greater than during the period complained of. It would appear from the testimony last referred to that the cattle injury and loss of milk production complained of were either not due in any material degree to fluorine or were the result of an accumulation of fluorine deposits in forage over a period including several years prior to the limitation period. In this connection it should be noted that the experts produced by plaintiffs testified that fluorine deposits on forage dissipate rapidly and do not accumulate over any great length of time, particularly in areas subject to frequent rainfall.

Each of the veterinarians examined all of the dairy cattle in plaintiffs' herds and cattle urine was tested for fluorine by defendant's veterinarians at various intervals during the period in question. Plaintiffs' veterinarians found a variety of physical conditions in the cattle which they considered evidence of fluorine ingestion and damage resulting therefrom. Defendant's veterinarians accounted for many of the ailments and defects referred to by ascribing them to other causes and categorically were of the opinion that none of the plaintiffs' cattle had suffered injury or damage in any respect by reason of fluorine ingestion, testifying that the urine analysis supported such opinion. The court was favorably impressed with the ability, integrity and thoroughness of defendant's veterinarians and, to say the least, is of the opinion that there is no preponderance in favor of plaintiffs in the evidence of the veterinarians.

Another phase of the evidence was concerned with studies of the quantity, character and distribution of fluoride effluence from defendant's plants. Plaintiffs' evidence indicated a greater quantity and wider distribution of effluence than the evidence offered by defendant; however, the range of difference between the estimates does not appear to be particularly significant in view of the low quantity at maximum of escaping fluorides distributed over a large area. This is indicated by the testimony of plaintiffs' witness, Dr. Cadwell, who testified that at the rate of fluoride escape estimated by plaintiffs' witness, Dr. Schulein, about ½ pound per acre per year would be deposited at two miles from a plant; ²⁄₁₀ths to ³⁄₁₀ths of a pound per acre per year at four miles from a plant; and ¹⁄₁₀th of a pound per acre per year at eight miles from a plant. Dr. Cadwell testified that a half pound of

particulates would be about the size of his fist in volume.

A very extensive program for sampling forage and testing it for fluorine content has been conducted over a period of years in a wide area surrounding defendant's plants. The work has been done by state and college scientists aided and assisted by defendant and others. The results of this work are shown in the agreed facts stated in the pretrial orders and in the evidence. There is little, if any, dispute as to the samples taken and their fluorine content as shown by laboratory measurement, but the interpretation of the data is in conflict. The conflict largely hinges on what part of the fluorine found in the samples is to be considered within the limit naturally and normally found in vegetation and what part is to be charged to deposits presumably emanating from defendant's plants, as to which a great many variable factors, some involving scientific questions not yet fully settled, must be considered. A fair inference from a full consideration of the evidence on this phase of the case is that some part of the fluorine found in the forage at points within the vicinity of plaintiffs' farms during the period in question in these cases is attributable to fluorides escaping from defendant's plants, but the amount and character thereof is a matter of speculation and cannot be determined with any degree of certainty. In all probability some areas in the near vicinity of the plants receive deposits of particulates or solids in a minute and powdery form so fine as not to be observable even by scientific methods. There is no evidence in the record indicating that direct observation has been made of solid deposits on plaintiffs' farms or at any other place as distant from the plants as the nearest of plaintiffs' farms.

A further factor complicating the matter is the necessity of using test data from samples gathered at more or less infrequent intervals at scattered points and attempting to draw inferences from averages of such data as to particular properties not precisely at a sampling station. It is apparent from the data itself that rather wide variations occur geographically, climatically and by season. When all of these matters are considered it can be seen that any specific finding of fluorine content in forage on the particular property of any plaintiff must very largely if not wholly be a matter of speculation and conjecture.

The next branch of the evidence to be considered has to do with the testimony given by the several scientists on both sides of the case concerning the quantity of fluorine necessary to produce toxic effects in cattle. Much scientific research has been devoted to this subject and is continuing. Elaborate controlled experiments have been conducted in this field over a period of years but ultimate conclusions generally accepted by scientists have not yet been reached. It may well be that individual peculiarities of cattle and the area in which they are grazed will prevent any absolute scientific finding which will be generally applicable as a measure of, or even general guide to, the quantity of fluorine that will physically injure cattle or lower their milk producing capacity.

The court was much impressed with the ability, scientific attitude and credibility of Dr. Paul H. Phillips, Professor of Biochemistry at the University of Wisconsin, and Dr. Harold J. Schmidt of Stanford University Research Institute. Each is one of the very few top authorities in his scientific field and both testified in a frank and fair manner giving the impression of scientific candor and objectivity. These men have given special attention over a long period of time to the effects of fluorine ingestion in cattle and have personally conducted elaborate scientific experiments with extensive herds devoted exclusively to such purpose. Both Dr. Phillips and Dr. Schmidt testified without reservation that cattle could and actually had ingested fluorine over considerable periods in amounts far exceeding the maximum shown to have been available for ingestion by plaintiffs' animals without injurious effect either as to physical condi-

tion or milk production capacity. Plaintiffs' witness, Professor Cheldelin, testified that in his opinion inorganic fluorine, such as found in the effluence from defendant's plants, after deposit on vegetation is absorbed in the plant cells and therein converted to organic fluorine developing thereby much more highly toxic powers; but he admitted that such theory has never been demonstrated or proven by actual experiment and, at the present stage of science, is merely a matter of theory not endorsed by scientists generally. The court accepts the testimony of Dr. Phillips and Dr. Schmidt at substantially full face value and in doing so cannot but conclude that on the issues covered by their testimony, plaintiffs have wholly failed to sustain the burden of proof resting on them in these cases.

The final general issue of fact covered in the evidence relates to plaintiffs' claims of depreciation in the fair market value of their real properties. Two realtors testified for plaintiffs and two for defendant and again the opinions expressed were in sharp conflict. Mr. Holbrook and Mr. Rodman made unusually careful and extensive studies of land sales in the vicinity of plaintiffs' properties over a ten-year period and the extreme care taken by them in examining the properties and considering every favorable and unfavorable element bearing on the market value of the land was very impressive. In my opinion the evidence overwhelmingly preponderates against any finding that the real property of any plaintiff has been depreciated in market value in any amount whatever during the period in question by reason of the operation of defendant's aluminum plants.

In the light of the conclusions thus summarized, as well as from a consideration of many phases of the record not particularly mentioned, I have reached the following basic conclusions on the factual issues of the case: Plaintiffs have not sustained the burden of producing a preponderance of credible evidence to establish (a) fluorine con-

tent in the forage on their lands in amounts above non-toxic limits; (b) substantial fluorine content in forage attributable to effluence from defendant's plants; or (c) that plaintiffs' lands or cattle sustained fluorine damage in particulars and amounts that can be determined with reasonable or any certainty.

Under this view of the evidence, the basic question of law presented is as to the legal basis of the rights of action on which plaintiffs seek relief in these actions. In the complaints and pretrial orders plaintiffs grounded the actions in trespass, as distinguished from trespass on the case, and later asserted nuisance as an alternative basis of liability. An injunction restraining continued operation of defendant's plants and damage awards were prayed for. Early in the proceedings the removal of the actions to the Oregon District Court on the ground of *forum non conveniens* was sought by defendant. The matter was extensively briefed and argued before then District Judge James Alger Fee sitting in this court by assignment. In an opinion reported at 107 F.Supp. 51, Judge Fee, on the allegations of the complaints and upon the oral statements of plaintiffs' counsel during the hearing on the motion for removal, for the limited purposes of that motion accepted plaintiffs' contention that the actions sounded in trespass. Removal was denied for several reasons but principally because under Oregon Supreme Court decisions that court has held itself without jurisdiction to deal with actions for trespass on lands outside of Oregon. There is no indication in Judge Fee's opinion or elsewhere in the record that consideration was given to the Washington law as to whether actions of the nature of the present cases sound in trespass rather than trespass on the case. Washington law was neither directly nor indirectly considered, stated or applied in the removal decision. The parties agree that under Erie R. Co. v. Tompkins, 305 U.S. 673, 59 S.Ct. 229, 83 L.Ed. 436, on sub-

stantive issues the cases must be decided according to Washington law.

■ By appropriate motion prior to settlement of the pretrial orders, the applicable period of limitation of action under Washington law was presented, argued at length and determined by informal memorandum decision. The Washington statute RCW 4.16.080 provides a three-year limitation for:

"(1) An action for waste or trespass upon real property;

"(2) An action for taking, detaining or injuring personal property, including an action for the specific recovery thereof, or for any other injury to the person or rights of another not hereinafter enumerated".

RCW 4.16.130 provides a two-year limitation for actions not otherwise covered in specific statutes of limitation. The pertinent portions of this court's memorandum decision, on limitation are: "When RCW 4.16.080 (Rem. § 159) and RCW 4.16.130 (Rem. § 165) are considered in the light of the long settled and frequently applied interpretation thereof by the Washington State Supreme Court there is no room for doubt that neither subsection (1) nor subsection (2) of RCW 4.16.080 (Rem. § 159) is applicable to the above cases. I am fully satisfied that under the allegations in the pleadings of the above cases the two-year limitation provided for under RCW 4.16.130 (Rem. § 165) must be applied to the claims for damages both to real and personal property. This conclusion seems inescapable under the following decisions construing subdivision (1) of RCW 4.16.080 (Rem. § 159): Suter v. Wenatchee Water Power Co., 35 Wash. 1, 76 P. 298; Weller v. Snoqualmie Falls Lumber Co., 155 Wash. 526, 285 P. 446; Riblet v. Spokane-Portland Cement Co., 41 Wash.2d 249, 248 P.2d 380; and the following decisions construing subdivision (2): Northern Grain & Warehouse Co. v. Holst, 95 Wash. 312, 163 P. 775; Clark Lloyd Lumber Co. v. Puget Sound & Cascade Ry. Co., 92 Wash. 601, 159 P. 774; Irwin v. J. K. Lumber Co., 119 Wash. 158, 205 P. 424; Constable v. Duke, 144 Wash. 263, 257 P. 637; Noble v. Martin, 191 Wash. 39, 70 P.2d 1064; Luellen v. [City of] Aberdeen, 20 Wash. 2d 594, 148 P.2d 849. The conclusion above stated was reached entirely without regard to the fact that Judge Leavy held likewise in Perrin v. Aluminum Company of America and Thayer (W.D. Wash., S.D., 1950)."

The Perrin case, tried in this court, was concerned with alleged fluorine damage to land and cattle in Oregon due to plant operations in Washington. Judge Leavy found and stated the Washington law of limitation as indicated, which he held applicable as law of the forum. Plaintiffs contend that under its circumstances the Perrin decision is not authoritative in the present cases either on limitations or on substantive law as to the legal basis of the actions. Determination of such contentions is not necessary since the Washington law of trespass and limitation stated herein is derived directly from the decisions of the Washington Supreme Court.

■ Implicit in this court's limitation decision was a determination of the legal basis of the actions as being trespass on the case under Washington law. Without concern whether such decision became law of the case, the subject has again been fully reviewed and reconsidered against the background of the evidence. A review of the Washington cases cited in the limitations decision, and in particular Suter v. Wenatchee Water Power Co., supra, leaves this court in no doubt but that the Washington Supreme Court regards claims of the nature of those presented in these cases as being based on common law trespass on the case as distinguished from trespass quare clausum fregit. The Suter case has been cited and quoted many times by the Washington Supreme Court without a single instance of deviation from the language and rationale of that case in so far as the elements distinguishing trespass from an action on the case are concerned.

The Washington court holds that when the injury complained of is the immedi-

ate and direct result of defendant's acts or omissions, the action is for trespass whereas when the injury is consequential, the action is on the case. In Suter v. Wenatchee Water Power Co., supra, the injury was held consequential and the action on the case, even though flood waters, resulting in instantaneous damage, suddenly were precipitated from defendant's canal onto plaintiffs' farm lands. The negligence causing the damage occurred prior to the flooding in the construction and maintenance of the canal. The distinction drawn by the Washington court between immediate and consequential injury is based on the character of the acts or omissions causing the injury and on whether the injury results immediately upon the occurrence of the act or omission. In the present cases the injury to plaintiffs, if any, was of a non-intentional character occurring a considerable time following the failure of inability of defendant to completely eliminate the effluence of fluorides from its plants; accordingly, the injury was consequential rather than immediate and direct as those terms are interpreted by the Washington court in the law of trespass.

■■ In an action on the case, it is necessary for plaintiff to allege and prove more than formal injury; but when trespass be proven, liability is absolute and at least nominal damage must be awarded. Even though it were assumed that solids in the form of minute particulates from defendant's plants have been deposited on plaintiffs' lands, the injury, if any, resulting therefrom was consequential, the action is on the case, and awards of nominal damages would not be justified by the facts or required by the law.

As for plaintiffs' alternative claim for relief grounded in nuisance, the Washington Supreme Court in Riblet v. Spokane-Portland Cement Co., supra, a case involving dust discharged from a cement plant, said at page 254 of 41 Wash.2d, at page 382 of 248 P.2d:

"Our basic point of inquiry relates to the general theory of the law of nuisance. This appears primarily to be based upon generally accepted ideas of right, equity and justice. The thought is inherent that not even a fee-simple owner has a totality of rights in and with respect to his real property. Insofar as the law of nuisance is concerned, rights as to the usage of land are relative. The general legal principle to be inferred from court action in nuisance cases is that one landowner will not be permitted to use his land so unreasonably as to interfere unreasonably with another landowner's use and enjoyment of his land. The crux of the matter appears to be reasonableness. Admittedly, the term is a flexible one. It has many shades and varieties of meaning. In a nuisance case the fundamental inquiry always appears to be whether the use of certain land can be considered as reasonable in relation to all the facts and surrounding circumstances." ●

■ It should be clear from the findings of fact and comments thereon previously made herein that the view of the evidence taken by the court does not warrant a finding that the operation of defendant's plants and resulting effluence therefrom constitutes an unreasonable interference with plaintiffs' use and enjoyment of their lands. The court is fully satisfied that the utility of defendant's plant operations and their importance to the economy and security of the nation far outweigh any injury to plaintiffs shown by the evidence. Consequently, neither a finding of nuisance nor granting of relief based thereon is justified.

The closing or curtailing of the operation of either of defendant's plants by injunction clearly is not warranted by the evidence under any theory.

Findings, conclusions and judgment in accordance herewith may be presented.