FAIRVIEW FARMS, INC., a corporation,
Plaintiff,

v.

REYNOLDS METALS COMPANY, a corporation, Defendant.

Civ. No. 6902.

United States District Court
D. Oregon.
July 9, 1959.

Robert F. Maguire and Alfred A. Hampson, Jr., Maguire, Shields, Morrison & Bailey, Portland, Or., for plaintiff.

Fredric A. Yerke, Jr., and Clifford N. Carlsen, Jr., King, Miller, Anderson, Nash & Yerke, Portland, Or., Gustav B. Margraf and W. Tobin Lennon, Richmond, Va., for defendant.

EAST, District Judge.

The plaintiff, Fairview Farms, Inc., an Oregon corporation (Fairview), instituted these proceedings against the defendant, Reynolds Metals Company, a Delaware corporation (Reynolds), on March 23, 1953, alleging the amount in controversy, exclusive of interest and costs, to be in excess of the sum of $3,-000, and alleging a diversity of citizenship between the parties. Jurisdiction is acquired pursuant to Title 28 U.S.C.A. § 1332.

The trial of the cause was had by the Court without a jury, and continued for a total of 41 trial days. The transcript of the evidence and written briefs on behalf of the respective parties are voluminous, and the Court heard oral arguments by counsel on January 13 and 16, 1959.

#### Pertinent Parts of Pretrial Order, Preliminary Statement and Agreed Facts.

Fairview, during all pertinent times, has and does operate a dairy farm upon

the hereinafter mentioned tracts of land northwest of Troutdale, Multnomah County, Oregon. Reynolds operates an aluminum reduction plant immediately east of said dairy farm. In this action Fairview contends that its dairy cows have been injured and the production of milk decreased as a result of consuming forage grown on said dairy farm upon which have settled fluorides emitted from said plant.

Fairview also contends that the fume control system installed by Reynolds is not sufficient to control the emanation of gases, liquids and solids containing flourides from said plant.

Fairview further contends that, unless the emanation of the said gases, liquids and solids containing fluorides is controlled, the trespass which is now occurring in respect of Fairview's farm will become permanent with a resulting depreciation in value, and in addition to alleged damages Fairview seeks a permanent injunction against Reynolds restraining the operation of said plant.

These contentions are denied by Reynolds.

Fairview leased from Charles E. Eckelman, one of the officers of Fairview, approximately 158 acres of real property situate northwest of Troutdale, Multnomah County, Oregon, and has continued to lease said real property from Charles E. Eckelman since December 31, 1935, and is leasing the same today.

In addition to this property, Fairview entered into a contract with Far West Realty Co., dated April 15, 1935, to buy 45 acres of real property. Fairview received a deed to said property August 31, 1943.

Fairview also leased 75 acres of real property from Portland Trust and Savings Bank, and purchased the same on July 15, 1943.

Charles E. Eckelman leased, by lease dated June 27, 1945, 175 acres of real property from Ernest G. Swigert, et ux., and W. G. Swigert, et ux. Fairview entered into a contract to purchase said real property from Ernest G. Swigert,

et ux., and W. G. Swigert, et ux., on March 12, 1947. Fairview received a deed to said property May 26, 1953.

By contracts between Fairview and Eva B. Stone and Fairview and B. Josephine Fox, dated September 20, 1948, and October 7, 1948, respectively, Fairview agreed to purchase 42 acres of real property. Fairview received the deed to said property September 8, 1953.

On or about December 21, 1943, Fairview leased 60 acres of real property from the Port of Portland and has leased the same ever since. This property lies east of the 158 acres owned by Charles E. Eckelman.

Fairview, since at least September 23, 1946, has continuously used, and today is using all of said real properties for the operation of a dairy farm. On said farm Fairview produces milk and cream for human consumption, and, in addition, on a portion of said farm, Fairview processes milk and cream produced by it and purchased from others. The products thus processed are thereafter distributed by Fairview. In the operation of said dairy, said lands are principally used for pasture and the raising of forage crops for dairy cows, and Fairview has at some expense installed an irrigation system to irrigate said lands.

During 1941 and 1942, Aluminum Company of America constructed for Defense Plant Corporation the first stages of said aluminum reduction plant north of Troutdale, Multnomah County, Oregon.

Said aluminum reduction plant was operated by Aluminum Company of America under an agreement of lease with Defense Plant Corporation from May 20, 1942, to September 7, 1945, at which time operations ceased. During the period that said plant was being operated by Aluminum Company of America, no fume-collecting system was in operation.

On or about January 11, 1946, Fairview submitted to Aluminum Company of America a claim in writing for compensation for damages to dairy cows and

loss of milk production which Fairview alleges were due to the operation of said aluminum reduction plant. Thereafter, Fairview executed a release agreement and received the sum of $40,061.07. On or about October 3, 1946, Fairview executed the final release agreement and received the sum of $3,500.

Said aluminum reduction plant was not operated during the period commencing September 7, 1945, and ending September 23, 1946.

In 1946, the United States of America, through the Reconstruction Finance Corporation, leased said plant to Reynolds, who commenced operating the same on or about September 23, 1946. Since September 23, 1946, Reynolds, first as lessee and then as owner, has been in possession of and, except for the short periods of shutdown due to flood conditions and labor difficulties, has continuously been operating said aluminum reduction plant for the production of aluminum and no other metal.

In the course of the production of aluminum by Reynolds at said aluminum reduction plant, the following raw materials, among others, were and are being used:

1. Petroleum coke
2. Pitch
3. Alumina (aluminum oxide)
4. Cryolite (sodium aluminum fluoride)
5. Aluminum fluoride
6. Calcium fluoride (fluorspar)
7. Soda ash.

Said raw materials are combined in the pots into which electric energy or current is introduced, and aluminum in liquid form is electro-deposited in the cavity at the base of each pot.

In the course of operating said aluminum plant, those fluoride compounds not absorbed in the pot lining or not captured by the fume collection system emanate from said plant in the form of fumes, gases, liquids and particulates.

Since February 8, 1947, and until the summer of 1951, Reynolds has had in operation in its plant 512, and since 1951,

536 pots or cells, each approximately 18′ in length, 6′ in width and 2′ deep and contains in the normal course of operation 7,200 pounds of cryolite, aluminum fluoride, calcium fluoride or fluorspar in molten condition. The materials added to all of the pots each day to retain the necessary quantity for electrolytic purposes therein contain an average of five tons of fluorine. This replacement is necessary because of the emanation in the form of gases and particulates from the pot of fluorine containing compounds and absorption of said compounds in the carbon lining of the pots.

As originally constructed, and until modified as hereinafter set forth, each of the potline buildings at said plant had long openings or vents along the roof and openings along the base of each side thereof. When the pots are in operation, air enters the potline building through the openings at the base of the sides of the building and through any other openings or doors or windows if open. By reason of the temperature of the pots in said buildings, the air entering the buildings combines with the gases, fumes and particulates being evolved from the pots, and, as originally constructed and until modified as hereinafter stated, the combination was carried upward and out through said long openings or vents in the roofs of the buildings or through any open windows or doors.

Before Reynolds commenced operations at said plant on September 23, 1946, Reynolds had installed in the vents along the roofs of the potline buildings water pipes and spray heads for the purpose of precipitating a portion of the gases, fumes and particulates, including fluorides, passing out of said vents. The cost of installing such system was approximately $271,846, and said amount was paid by the United States.

On or about June 1, 1949, Reynolds commenced the construction and installation of a different gas, fume and particulate collecting system at said plant. The installation of this system was completed on or about November 3, 1950. This system consists of hoods for all pots in said plant, the connection thereof

to an induced-draft system for the removal of gases, fumes and particulates from said pots, dust collectors and wash towers for the capture of the gases, fumes and particulates passing into the induced-draft system before the release thereof into the air, and roof scrubbers for the capture of gases, fumes and particulates not drawn into the induced-draft system and for washing of the same. Said dust collectors are cyclones manufactured by American Blower Corporation, Design 13, No. 28, Type D Collectors, Series 311, arrangement 12. The cost of installing such system was approximately $2,139,185. Said devices did not and have not prevented all gases, fumes, liquids and particulates from escaping from said plant, some of which have settled and do settle at various times upon some of Fairview's fields. After the addition of the pots in 1951, Reynolds installed hoods and ducts for each of the additional pots, but did not install additional cyclones, wash towers or roof scrubbers.

The gases, fumes, liquids and particulates emanating into the atmosphere from said plant consist principally of hydrogen fluoride (hydrofloric acid), cryolite (solid), calcium fluoride (solid), iron fluoride (solid), and silicon tetrafluoride (gas-acid), and are in the form of gases, liquids and solids and are immediately diffused in the air and become air-borne and portions thereof have settled and do settle at various times upon some of Fairview's lands and the vegetation thereon.

During the period when said plant was being operated by the Aluminum Company of America, a greater amount of fluorine in the form of fluorides escaped each 24-hour day from said plant when all four potlines were in operation than the amount of fluorine in the form of fluorides which has escaped each 24-hour day from said plant when all four potlines were in operation since Reynolds commenced operating said plant. The average amount of fluorine as fluorides emanating from the Troutdale aluminum reduction plant per 24-hour day from January, 1947, through December, 1955, according to Reynolds' measurements, is approximately as follows:

|  | Pounds |
|---|---|
| January through December, 1947 | 2845 |
| January through December, 1948 | 2840 |
| January through December, 1949 | 2640 |
| January, 1950 | 3281 |
| February, 1950 | 3795 |
| March, 1950 | 3988 |
| April, 1950 | 3216 |
| May, 1950 | 2895 |
| June, 1950 | 2187 |
| July, 1950 | 1608 |
| August, 1950 | 1480 |
| September, 1950 | 1160 |
| October, 1950 | 900 |
| November, 1950 | 643 |
| December, 1950 | 643 |
| January through December, 1951 | 785 |
| January, 1952, through December, 1952 | 700 |
| January, 1953, through December, 1953 | 750 |
| January, 1954, through June, 1954 | 725 |
| July, 1954, through December, 1954 | 775 |
| January, 1955, through March, 1955 | 850 |
| April, 1955, through June, 1955 | 840 |
| July, 1955, through September, 1955 | 855 |
| October, 1955, through December, 1955 | 885 |

Fluorides of the types emitted from the plant operated by Reynolds, if deposited in sufficient quantities upon Fairview's hay, grasses, feed and forage crops, would render the same unfit for use as dairy cow food, and if ingested in sufficient quantities, are capable of causing damage to the cows. Said fluorides do not injuriously affect the quality of the milk so produced and do not injuriously affect its palatability or wholesomeness for human consumption.

At and prior to the time Reynolds commenced operating said plant, Fairview notified Reynolds that it would hold Reynolds responsible for whatever damage resulted from its said operations, and Reynolds advised Fairview that it would install in its plant devices and procedures which would prevent any damage to Fairview from the operation of its plant, and thereafter Fairview continued to operate its farm and dairy, and continued to feed its dairy cows the hay, grasses and feed produced upon its farm, and continued to pasture said cows upon said lands, except as hereinafter stated. Reynolds did not install in its plant devices or procedures adequate to prevent the escape of all said gases, fumes and particulates, and as a result some of said gases, fumes and particulates settled upon Fairview's feed, crops and pasturage. Reynolds advised Faiview that it was still attempting to perfect methods of controlling the escape of said gases, fumes and particulates and that it was just a question of time before more effective methods would be in operation. In 1950, after Reynolds completed the installation of the additional fume control devices, Reynolds notified Fairview thereof and notified Fairview that said devices were designed to retain practically all the gases, fumes and particulates emitting from the plant.

Reynolds advised Fairview that it had and would maintain a laboratory and employed and would employ chemists who could and would timely and continually take samples of the forage crops growing and to grow upon Fairview's fields and make true and accurate chemical and other analyses thereof, and that it would inform Fairview when said fields were free from contamination by gases, fumes and particulates emitted from Reynolds' plant and were safe for pasturing by Fairview's dairy cows, and what crops and silage grown therefrom could be safely used for feed, and that when said fields were contaminated to such degree as to be unsafe for use it would notify Fairview thereof.

During a period commencing May 24, 1947, and ending June 27, 1947, at Reynolds' request, Fairview did not pasture dairy cows on various fields because of the fluorine content of grass growing in said fields which Reynolds had taken and analyzed. By reason of not using said fields, Fairview incurred $6,724 in expenses in purchasing hay and silage, which Reynolds paid on October 22, 1947.

From September 19, 1947, to October 19, 1947, Fairview did not pasture dairy cows on various fields after being advised by Reynolds not to use said fields because of the fluorine content of the same. Thereafter, Fairview presented Reynolds with an invoice for the sum of $4,153.23, relating to hay and grain purchased in lieu of the pasturage, which Reynolds paid on November 17, 1947.

Thereafter, between October, 1947, and December 6, 1951, and on some 21 occasions or short periods of time, Fairview, upon advice from Reynolds, did on occasions not pasture various fields, and on various occasions destroyed forage and grass silage, all due to fluorine contamination, for which Fairview purchased hay and other forage at purchase prices in the aggregate amount of $81,120.41, all of which expenses and purchase prices Reynolds timely paid Fairview upon presentation of invoices.

In each instance of the foregoing payments by Reynolds, Fairview executed its release of claims, respectively.

### Theories of Trespass and of Nuisance.

Fairview insists that its case against Reynolds for knowingly to allow the gaseous, liquid and solid fluorides to ema-

nate and escape from its plant and become deposited upon its lands with alleged resulting damage to its lands and herd forage thereon, with the resulting damage to its herd and loss of milk production from April 1, 1947, to December 31, 1955, rests in trespass. A six-year statute of limitations applies to actions in trespass in Oregon.[1]

Reynolds rests on the proposition that the escaping fluorides and settling on Fairview's lands was not of sufficient quantity to injure Fairview's lands or its dairy cow herd foraging thereon, or, if any damage was done it was *de minimus*. Reynolds also contends payment and satisfaction for all damage actually done.[2] Further, Reynolds insists that if, in fact, damage was caused to Fairview's lands and herd, then it became liable only under the theory of nuisance, and contends that Fairview's action is barred by Oregon's two-year statute of limitations on actions upon alleged nuisance.[3]

This Court previously held that during comparable times Reynolds' operation of the Troutdale plant was not an "ultra hazardous activity from which absolute liability stems"; however, whether or not Reynolds was negligent towards neighboring farm landowners in allowing flourine particulates to escape from its plant, with resulting alleged injury to persons, was a question of fact for a jury in an action based upon alleged negligence. Martin v. Reynolds Metals Company, D.C., 135 F. Supp. 379, affirmed Reynolds Metals Co. v. Yturbide, 9 Cir., 258 F.2d 321, certiorari denied 358 U.S. 840, 79 S.Ct. 66, 3 L.Ed.2d 76.

1. ORS 12.080:
   "*Within six years.* * * *
   (3) An action for waste or trespass upon real property; or
   (4) An action for taking, detaining or injuring personal property, including an action for the specific recovery thereof; shall be commenced within six years. [Amended by 1957 c. 374 § 3]"

2. See agreed facts.

## Basis of Liability.

From the evidence adduced and for the reasons to be pointed out, this Court is satisfied that Reynolds' conduct in operating its plant when it well knew flourides were escaping therefrom and settling upon Fairview's lands in quantities then deemed to render forage thereon unsafe for dairy cow consumption, and in turn causing damage to the said forage for which it paid compensation, constituted an intentional tort on Reynolds' part. This conclusion of an intentional tort on the part of Reynolds presents two fundamental questions:

(1) The basis of liability, if any; and

(2) The amount and character of damage resulting from the tortious act, if any, and the remedies, if any, therefor.

Due to the complexity of the question of liability on the part of Reynolds, if any, and the second question of resulting damage to Fairview's lands or its herd, with the resulting alleged loss of milk production, if any, this Court, on its own motion, segregates these two issues and now directs its attention to the question of liability, reserving the question of damages, if any, to a later and more studied consideration.

A review of the Oregon Supreme Court's cases involving trespass or nuisance injury to lands does not give this Court a simple or satisfying answer to the problem here presented. As the Oregon Supreme Court has never been faced with a situation as here involved, this Court must anticipate what that Court would hold if confronted with a controversy such as that presented herein.[4]

3. ORS 12.110:
   "Within two years; * * * (1) An action for assault, battery, false imprisonment, for criminal conversation, or for any injury to the person or rights of another, not arising on contract, and not especially enumerated in this chapter, shall be commenced within two years; * * *"

4. Compania Engraw Commercial E. Industrial S. A. v. Schenley Dist. Corp., 9 Cir., 181 F.2d 876, cited in Ward v. Union Bond & Trust Co., 9 Cir., 243 F.2d 476.

The Oregon Supreme Court, in two recent well-reasoned nuisance decisions, has stated:

"* * * we will * * * not decide the point 'upon authority alone, divorced from reason or public policy.'" East St. Johns Shingle Co. v. City of Portland, 195 Or. 505, 514, 246 P.2d 554, 558; Amphitheaters, Inc. v. Portland Meadows, 184 Or. 336, 361, 198 P.2d 847, 5 A. L.R.2d 690.

■ With this admonition this Court considers Fairview's cause well-founded in trespass.

"The action for private nuisance originated in the assize of nuisance which dates back to as early as the Twelfth Century. This action was complementary to the assize of novel disseisin. While the assize of novel disseisin was an action for redressing interference with the seisin of land, the assize of nuisance provided redress where the injury was not a disseisin, as where there was no entry on the plaintiff's land but was an indirect damage to the land or an interference with its use and enjoyment. The assize of novel disseisin was directed to secure an undisturbed possession; the assize of nuisance to secure its free enjoyment." American Law Institute Restatement of Torts 1939, Division Ten, Ch. 40, Introductory note, p. 218.

The historical distinction between trespass and nuisance concerned a court's ability to ascertain if some direct invasion was in fact made. Such an invasion could only be sustained under a trespass theory if the Court could see some physical intrusion by tangible matter. Intangible subjects such as odors and gases were thus not historically considered trespasses, but were classified as nuisances.

Taking the above classic textbook explanation of trespass, we find that a person may commit a trespass by casting a grain of sand upon another's land. This is supported in Oregon by Sleep v. Morrill, 199 Or. 128, 260 P.2d 487, where a small amount of limbs and brush were deposited upon another's land and the plaintiff was successful in recovering damages on the theory of trespass. Once the courts found an invasion, at least nominal damages were awarded, even if no actual damage was done or even if the act constituted a benefit to the person whose land had been invaded by an unauthorized entry.

■ In Oregon there appear to be only three reported cases (See 7(a)) where the court was faced with a physical intrusion by air-borne matter. Upon these three cases Reynolds asserts that the law in Oregon stands for the proposition that the settling of industrial solids and liquids on the property of another does not result in a trespass. The first of these cases, Amphitheaters, Inc. v. Portland Meadows, supra, stands only for the proposition that under the given facts of that case the casting of light is neither a trespass nor a nuisance.[5] The two other Oregon cases cited by Reynolds involve wind-borne ashes, cinders, shavings, sawdust and smoke. Bourne v. Wilson-Case Lumber Co., 58 Or. 48, 113 P. 52; Lindley v. Hyland, 173 Or. 93, 144 P.2d 295. In neither of these cases does it appear that the cause of action was based upon trespass, but each case affirmatively indicates that the moving party relied solely upon the theory of nuisance. The two torts are not mutually exclusive, and a finding of a nuisance does not preclude the existence of a trespass. State ex rel. Rudd v. Ringold, 102 Or. 401, 202 P. 734, 735, contains dicta to the contrary,[6] but that cause involved a mandamus proceeding brought to enforce a fire ordinance deal-

---

5. "We limit our decision to the specific facts of this case. * * *" [184 Or. 336, 198 P.2d 847]

6. "A private nuisance is anything done to the hurt, annoyance, or detriment of the lands or hereditaments of another, *and not amounting to a trespass.*" [Italics supplied.]

ing with a public nuisance and in no way involved a trespass.

Adams v. City of Toledo, 163 Or. 185, 96 P.2d 1078, is likewise an action based on nuisance, with no claim or assertion of trespass having been made. This Court is satisfied that if the question were presented to the Oregon Supreme Court today, it would find that nuisance and trespass are not mutually exclusive torts.[7]

Decisions in other states have found that in the case of air-borne matter physically intruding upon the plaintiff's property the cause of action rests in nuisance, not trespass. See Annotation 54 A.L.R.2d 764. Many of these cases are distinguishable on the basis that plaintiff failed to prove that any solid matter was deposited on his land, while in others there is no indication that the theory of trespass was presented to the court. A few cases hold directly contra to the holding of this Court, but a reading of those cases leaves this Court with the impression that the foreign jurisdiction was looking past the initial question of whether there was in fact a trespass and was concerned with balancing the equities to determine the existence or nonexistence of a trespass. That line of cases this Court rejects, and holds that air-borne liquids and solids deposited upon the Fairview lands constituted a trespass. As early as 1911 the Oregon Court recognized our changing society and noted:

"Old things have passed away to a certain extent and many changes have taken place in * * * civilized life."

Templeton v. Williams, 59 Or. 160, 164, 116 P. 1062, 1063, 35 L.R.A.,N. S., 468.

■ One of these changes is scientific development which today allows the court, with the aid of scientific detecting methods, to determine the existence of a physical entry of tangible matter, which in turn gives rise to a cause of action in trespass under the Oregon Court's holding that every unauthorized entry upon land of another constitutes actionable trespass. Kesterson v. California-Oregon Power Co., 114 Or. 22, 228 P. 1092.

The Oregon Supreme Court, in dealing with a "blasting case," reported in Bedell v. Goulter, 199 Or. 344, at page 362, 261 P.2d 842, at page 850, and speaking through Mr. Justice Lusk, advises:

"But logic, we are told by eminent authority, is not 'the life of the law'. Basic to the problem is 'an adjustment of conflicting interests', Exner v. Sherman Power Const. Co., 2 Cir., 54 F.2d 510, 80 A.L.R. 686, of the right of the blaster, on the one hand, to pursue a lawful occupation and the right of an owner of land, on the other, to its peaceful enjoyment and possession."—

and further (199 Or. at page 361, 261 P.2d at page 850)

" * * * there is slight difficulty in holding that one who engages in blasting operations which set in motion vibrations and concussions of the earth and air which reach to another's land—no matter how far distant—and shatter his dwelling, commits a trespass no less than one who accomplishes the same result by the propulsion of rocks or other material."

May I paraphrase Justice Lusk as follows (199 Or. at page 363, 261 P.2d at page 850):

"This Court's conclusion that plaintiff's case rests in trespass, though it may not have the support of ('the majority of') all of the Courts of this country, are, I think, consonant with the trend of present day judicial thinking and with modern concepts of justice."

7. See Laurance v. Tucker, 160 Or. 474, 479, 85 P.2d 374, where the Oregon court held that the tortious acts of the defendant were a trespass and indicated that if such acts were continued, they might constitute a private nuisance.

While the admitted escaping gaseous liquids and solid fluorides escaping from Reynolds' plant may not have been seen by the human eye, yet they could be fairly accurately measured and weighed in pounds and tons, and through scientific laboratory tests the resulting toxic flourine foreign matter contamination, as distinguished from a systemic injury to Fairview's forage, could be determined in parts per million.[7(a)]

Reynolds cites Norwood v. Eastern Oregon Land Co., 139 Or. 25, 5 P.2d 1057, 7 P.2d 996, which it contends stands for the proposition that an injury is a trespass only when it is immediately and directly occasioned by, and is not merely a consequence resulting from, the act complained of.

In the Norwood case the defendant diverted irrigation water to which the plaintiff was entitled. The wrongful diversion occurred some three to four miles distant from the lands of the plaintiff, and, therefore, in the commission of the wrongful act by the defendant there was no entry upon the plaintiff's land. We have found in this instance a physical entry upon Fairview's lands, and this factor distinguishes the instant case from Norwood.

Along the same rationale of Norwood is the recent District of Washington case of Arvidson v. Reynolds Metals Co., 125 F.Supp. 481. Arvidson is similar factually to the instant case in that the plaintiffs sought damages and injunctive relief against Reynolds Metals Co. for alleged escapement from its plant and subsequent deposit of fluorine upon plaintiffs' lands, with a resulting damage to cattle. Judge Boldt, hearing Arvidson " * * * reached the following basic conclusions on the factual issues of the case: Plaintiffs have not sustained the burden of producing a preponderance of credible evidence to establish (a) fluorine content in the forage on their lands in amounts above nontoxic limits; * * * (c) that plaintiffs' lands or cattle sustained fluorine damage in particulars and amounts that can be determined with reasonable or any certainty." [125 F.Supp. 486] This language advises us that there was no entry upon the plaintiffs' lands. Reynolds cites the Arvidson case as authority that the instant action sounds in nuisance rather than trespass, and Judge Boldt advises us that such is the law in the State of Washington, through the following language:

7(a). York v. Stallings, Or., 341 P.2d 529. In this case, the plaintiffs proceeded under the theory of nuisance, seeking to enjoin the defendants, who operate a sawmill, from interfering with the use and enjoyment of plaintiffs' premises and to recover damages. The plaintiffs complained that great quantities of smoke, sawdust, cinders, ashes and other particulates were deposited on plaintiffs' premises by reason of the defendants' operation of its sawmill. No theory of trespass was presented to the court; however, it is interesting to note the language of the court at page 535 of 341 P.2d:

"Although we are satisfied that the fallout from defendants' burner has entitled plaintiffs to some relief, there are several reasons why we are unable to affirm the decree of the lower court or to finally dispose of all the issues at this time. We have mentioned the lack of an accurate measurement of the fallout of sawdust and cinders on the York premises. In this day of general concern over fallout of radioactive particles and air pollution in large cities, the measurement of fallout is more than a matter of casual observation. We are not inclined to shut down defendants' mill on the strength of the general and rather indefinite impressions of witnesses who made only casual observations on occasional visits to the York home. Not when the fallout can be measured with reasonable accuracy by impartial tests— tests which if necessary can be made by direction of the trial court. See for example, Air Pollution Training Course Manual, U. S. Public Health Service."

Note: The York case has been handed down since counsel for the parties have filed their briefs herein and therefore was not heretofore referred to in this opinion, and, of course, is in addition to the "three reported cases" referred to on page 14 of this opinion [176 F.Supp. 185].

"A review of the Washington cases cited in the limitation decision, and in particular Suter v. Wenatchee Water Power Co., supra [35 Wash. 1, 76 P. 298], leaves this court in no doubt but that the Washington Supreme Court regards claims of the nature of those presented in these cases as being based on common law trespass on the case as distinguished from trespass *quare clausum fregit*. The Suter case has been cited and quoted many times by the Washington Supreme Court without a single instance of deviation from the language and rationale of that case in so far as the elements distinguishing trespass from an action on the case are concerned."

Such is the law in the State of Washington, but it is not controlling in the State of Oregon.

It is interesting to note that in an earlier stage of the Arvidson case, Judge James Alger Fee (then District Judge from Oregon), sitting in the District Court of the Western District of Washington, Southern Division, denied the defendant's motion for removal of the action to the Oregon District Court on the grounds of *forum non conveniens*, on the basis that the District Court of Oregon and the courts of Oregon have no jurisdiction over a *foreign trespass*.[8] [Emphasis supplied.]

It appears from a preponderance of the evidence in this case that the direct resulting consequence of Reynolds' trespass was physical damage and injury to Fairview's dairy cow herd and its loss of milk production.

■ The liability of the defendant can best be illustrated by the New York case of Van Alstyne v. Rochester Telephone Corp., 163 Misc. 258, 296 N.Y.S. 726. In that cause the defendant, in repairing a telephone cable, dropped small fragments of lead upon the plaintiff's land, which the plaintiff's dogs ate. As a result of this metallic diet, the plaintiff's dogs subsequently died of lead poisoning, and the defendant was held liable for their demise on the theory of trespass. Following the general rule in the case of tort-feasors, a trespasser is responsible for all injurious consequences flowing from his trespass which are the natural and proximate result of the trespasser's tortious conduct. It matters not that the injury complained of is removed in time from the tortious invasion. 52 Am.Jur., Trespass, §§ 47, et seq.

Controlling Statute of Limitations.

Since this Court has found that Fairview's cause rests firmly in trespass and not in nuisance, ORS 12.080, supra (six years), controls, and, therefore, Fairview's action for the entire claim period commencing April 1, 1947, and continuing through December 31, 1955, is not barred.[9]

Fairview's contention that Reynolds waived or is estopped to stop the statute of limitations is now moot.

Reynolds' Contention of Satisfaction and Release.

■ The agreed facts, supra, clearly reveal the consideration for Reynolds' payments to Fairview, namely, compensation for loss of contaminated forage from its lands and purchase prices of other forage in lieu thereof. The evidence is devoid of any accord and satisfaction or release of Fairview's claims in its present action.

---

8. "Notwithstanding the broad terms of the statute, the transfer cannot be made for jurisdictional reasons: first, the courts of the State of Oregon have no power to entertain or adjudicate *trespasses* upon real property situate in the State of Washington." [Emphasis supplied.] Arvidson v. Reynolds Metals Co., D.C., 107 F.Supp. 51, 52.

9. "This continued treatment (trespass) constituted a continuing tort causing the statute of limitations to start only when such treatment (trespass) ceased." Reynolds Metals Co. v. Yturbide, 9 Cir., 258 F.2d 321, at page 333.

## Denial of Accumulative and Penalty Damages.

Fairview contends that Reynolds' failure to capture the fluorine gases, liquids and solids and the casting of said fluorine upon Fairview's lands in harmful amounts constitutes an "intentional," if not a "willful" trespass. Therefore, additional accumulative double damages provided for by ORS 105.815 [10] and penal treble damages under ORS 105.810 [11] are recoverable. This Court rejects this proposition and holds that neither of these sections of ORS are applicable to Fairview's cause herein. As found in this cause, Reynolds has committed an intentional tort, but not a willful, in the sense of an evil, tort or wrong. In view of the fact that this Court has found that the evidence does not disclose a depreciation in the value of Fairview's lands by reason of Reynolds' tort, therefore, the case of Kinzua Lumber Co. v. Daggett, 203 Or. 581, 281 P.2d 221, is distinguishable in that Kinzua allowed accumulative double damages as being truly compensatory for the wrong of casual or involuntary, or under belief of right, severance of timber from plaintiff's lands. This conclusion makes unnecessary a ruling upon Reynolds' oral motion made in open court on June 21, 1956, for an order striking these contentions of Fairview from the pretrial order herein.

## Denial of Damage to Fairview's Lands.

It does not appear from a preponderance of the evidence in the case that Fairview's lands have been depreciated in value by reason of Reynolds' trespass, and an award of damage on this claim should be denied.

## Denial of Injunctive Relief.

This Court is of the opinion that throughout the claim period Reynolds' acts and ·conduct constituted a daily repeating trespass; however, it does not appear from the evidence that an award of compensatory damages for past trespasses and any future trespasses will not make Fairview whole. Furthermore, it does not appear from the evidence that the heretofore committed acts and conduct of Reynolds were reasonably certain to be repeated, or that Fairview would thereby be irreparably injured. As pointed out in the agreed facts, Reynolds progressively through the claim period improved its fluorine control system throughout its plant, at the ultimate approximate cost of $2,139,185.00. Adopting the language of Judge Boldt in the Arvidson case [125 F.Supp. 483] :

10. "If, upon the trial of an action included in ORS 105.810, it appears that *the trespass* was casual or involuntary, or that the defendant had probable cause to believe that the land on which *the trespass* was committed was his own or the land of the person in whose service or by whose direction the act was done, or that the tree or timber was taken from uninclosed woodland for the purpose of repairing any public highway or bridge upon the land or adjoining it, judgment shall be given for double damages." [Emphasis added.]

11. "Except as provided in ORS 477.310, whenever any person, without lawful authority, wilfully injures or severs from the land of another any produce thereof or cuts down, girdles or otherwise injures or carries off any tree, timber or shrub on the land of another person, or of the state, county, United States or any public corporation, or on the street or highway in front of any person's house, or in any village, town or city lot, or cultivated grounds, or on the common or public grounds of any village, town or city, or on the street or highway in front thereof, in an action by such person, village, town, city, the United States, state, county, or public corporation, against the person committing *such trespasses* if judgment is given *for the plaintiff, it shall be given for* treble the amount of damages claimed, or assessed *for the trespass*. In any such action, upon plaintiff's proof of his ownership of the premises and the commission by the defendant of any of the acts mentioned in this section, it is prima facie evidence that the acts were committed by the defendant wilfully, intentionally and without plaintiff's consent." [Emphasis added.]

"Whether the measures taken by defendant to minimize the escape of fluorides from its plants are the maximum possible consistent with practical operating requirements is yet to be determined, but apparently American industry has not yet developed anything better."—

this Court is of the opinion that the injunctive relief prayed for by Fairview should be denied.

Counsel for Fairview is requested to submit within 30 days from the date hereof proposed findings, conclusions and decree and judgment in conformity herewith, also providing for a finding of lump-sum compensatory general damages in $——— amount for damage and injury to Fairview's dairy cow herd as a whole, and said herd's loss of milk production. Fairview is granted costs of this action, taxed and fixed.