[636 NYS2d 300]

51 St. Nicholas Realty Corp., Appellant, v City of New York, Respondent.

First Department, January 9, 1996

344

**APPEARANCES OF COUNSEL**

*Jeffrey E. Glen* of counsel, New York City *(Susan Robbins* and *Berwin Leighton* on the brief, attorneys), for appellant.

*Linda H. Young* of counsel, New York City *(Pamela Seider Dolgow* on the brief; *Paul A. Crotty, Corporation Counsel* of New York City, attorney), for respondent.

**OPINION OF THE COURT**

Ross, J.

■ The issue to be determined on this appeal is whether or not plaintiff's complaint sufficiently states a cause of action for wrongful demolition so as to withstand the defendant-respondent City's motion to dismiss pursuant to CPLR 3211 (a) (7). Upon review of the allegations of the complaint, applicable sections of the Administrative Code of the City of New York, and the affidavits submitted by parties both in support of and opposition to the motion (*Rovello v Orofino Realty Co.*, 40 NY2d 633, 635), we find that a cause of action for wrongful demolition, sufficient under the circumstances herein to withstand the CPLR 3211 (a) (7) attack, is stated, and accordingly reverse the order appealed and reinstate the complaint.

The pleadings and submissions on the motion to dismiss establish that in May 1985, the building in question, located at 51 St. Nicholas Avenue, was owned by 150 Manhattan Avenue Corporation. On May 2, 1985 a property inspector and architect from the City were sent to the property to conduct an inspection. Following the inspection, a notice of survey and summons

dated May 2, 1985 informed 150 Manhattan Avenue Corporation that the building was unsafe and dangerous. The notice stated specifically that the "premises are vacant, open and unguarded, allowing entry by unauthorized persons and vandals and is an extreme fire, health and moral hazard". The notice further ordered the owner "to commence within 24 hours to take down and remove or make same safe and secure" and, to "demolish premises, remove all debris from lot and grade to curb level, as required by law; or seal the premises in the prescribed manner as delineated in the rules and regulations of this department; or repair and restore to previous lawful condition in conformance to the rules and regulations of this department". It was further provided in the notice that the matter would be placed before the Supreme Court, Special Term, Part II, 60 Centre Street, at 10:00 A.M. on June 10, 1985, unless the owner certified to the Borough Superintendent that it assented to make the premises safe in accordance with the notice provisions.

On June 10, 1985, the City brought an unsafe building proceeding pursuant to Administrative Code of the City of New York § 26-235 *et seq.* in Supreme Court, New York County. On that date, pursuant to Administrative Code § 26-239, the court (Thomas J. Hughes, J.) issued a precept finding the building unsafe and dangerous and "commanding" the Superintendent of Buildings for the Borough of Manhattan to "forthwith" make the building safe "by vacating and taking down said building to the ground and removing the materials". On or about June 10, 1985, a notice of pendency of the unsafe building proceeding was filed pursuant to Administrative Code § 26-246. However, no immediate action was taken by the City or the then owner toward demolishing the premises or otherwise complying with the precept.

Thereafter, on July 31, 1985, pursuant to In Rem Tax Foreclosure Action No. 31, Borough of Manhattan, Index No. 46001/82, the City became the record owner of the building. In January 1986, Gabriel Jeidel, as agent of the plaintiff corporation, entered into a contract to purchase the property from 150 Manhattan Avenue Corporation for $175,000. Pursuant to the contract, 150 Manhattan Avenue Corporation was to redeem the property from the City and then convey to plaintiff "marketable and insurable title * * * free and clear of any and all liens, encumbrances and judgments affecting the property." The contract also required 150 Manhattan Avenue Corporation to represent at closing that the premises were vacant and sealed.

Prior to the closing, which occurred on March 19, 1988, plaintiff's title company informed it that the notice of pendency filed in connection with the abovesaid unsafe building proceeding had not been discharged. In his affidavit filed in opposition to the motion to dismiss, plaintiff's agent, Mr. Jeidel, stated that there were two Emergency Repair Liens listed in addition to the City's notice of pendency on the schedule submitted to him by the title company prior to closing. Jeidel stated that, at closing, the title company reported that the Emergency Repair Liens had been discharged but the City's notice of pendency remained. The parties went forward with the closing despite the existing notice. Jeidel stated: "I assumed that in light of the seller's representations, my observations of the building,[*] and the clearance of all Emergency Repair Liens, that the Precept was no longer viable and that the discharge of the Notice of Pendency was a mere formality. Since under the CPLR the Notice of Pendency would expire by the passage of time in June, 1988, I felt that I could safely ignore it, and avoid paying an attorney to seek a formal discharge of record."

According to Jeidel's affidavit, he periodically inspected the building over the years following the closing and caused the plaintiff corporation to expend funds to keep the perimeter of the premises clean and clear of debris. However, rehabilitation of the building was forestalled by the plaintiff's inability to secure loans during the late 1980's. In addition, the record reflects that on May 17, 1991 the plaintiff entered into an in rem installment agreement with the City when payment of real estate taxes on the building fell into arrears. Pursuant to the agreement, which appears in the record, the plaintiff agreed to pay 16 quarterly payments of $655 each with payments commencing on July 1, 1991.

On June 25, 1992, a building inspector from the City inspected the building, reported it to be vacant, open and unguarded with the interior collapsed and in need of emergency demolition. No notice of this inspection or its result was communicated to the plaintiff. The inspector returned to the building on July 15, 1992 and found that the conditions he noted on his prior visit persisted. The Superintendent of Buildings then completed a demolition request form, dated July 16, 1992, and relied therein upon the June 10, 1985 precept issued

* According to Jeidel's affidavit, he inspected the exterior of the building prior to closing and "observed that it was in fact vacant and sealed". Attached to Jeidel's affidavit were photographs of the building taken both before and shortly after the closing.

by Justice Hughes in order to request emergency demolition. Plaintiff alleges, and it is apparently not disputed, that no notice was given to the plaintiff of the impending demolition by the Department of Buildings, despite the fact that there was an exchange of correspondence between the Department of Buildings, the Director of Demolition and Sealing of Housing Preservation and Development, and Community Board No. 10, which encompasses the block where the building is located. Thereafter, on November 15, 1992, the City, in reliance upon the June 10, 1985 precept, demolished the building. Plaintiff commenced the action underlying this appeal in April of 1993.

The IAS Court, in granting the defendant City's motion to dismiss plaintiff's complaint pursuant to CPLR 3211 (a) (7), found that plaintiff's knowledge that the precept had been issued when it purchased the building constituted sufficient notice under the circumstances, such that the City's failure to enforce the precept for seven years was "of no moment" and no additional notice was required prior to the demolition of the property by the defendant in 1992. The trial court stated: "[t]he fact of the matter is that the building remained unsafe, that the plaintiff knew it was unsafe and failed to have the precept vacated or correct the unsafe condition of the building." Thus, the IAS Court concluded that the owner of the building in question, once on notice that a precept had been issued in the past, bore the continuing burden of either moving to vacate or complying with the precept. The court held, in effect, that the defendant City could act upon the precept in question at any time without further application to the court or notice to the owner. This totally ignores the fact that the precept was issued seven years previously and directed the City to proceed "forthwith".

It is apparent from the court's findings of fact that it treated the defendant's motion made pursuant to CPLR 3211 (a) (7) as a motion for summary judgment pursuant to CPLR 3212. However, it did so tacitly without providing the parties with requisite notice as required by CPLR 3211 (c) (*see, Rovello v Orofino Realty Co., supra,* at 635). It has been held that where the parties deliberately chart a "summary judgment course by laying bare their proof * * * submitting extensive extrinsic documentary evidence and evidentiary affidavits setting forth the entire chronology and course of events leading up to [the] action", such notice is not strictly required (*O'Dette v Guzzardi,* 204 AD2d 291, 292; *see, Four Seasons Hotels v Vinnik,* 127 AD2d 310, 320). We conclude that on the record presented

in this case, such circumstances as would have allowed the trial court to dispense with the CPLR 3211 (c) notice did not exist. Therefore, our inquiry is limited to a determination of whether plaintiff has a viable cause of action (*Rovello v Orofino Realty Co.*, *supra*, at 636).

■ Generally, a statute is to be construed according to the ordinary meaning of its words (*Sega v State of New York*, 60 NY2d 183, 190-191). Resort to extrinsic matter is inappropriate when the language of the statute is unambiguous and the meaning unequivocal (*supra*, at 191). Review of the applicable sections of the Administrative Code (§§ 26-235—26-243) demonstrates that an unsafe building proceeding commenced by the City pursuant thereto compels action "forthwith" either by the local Superintendent of Buildings or the owner or other interested party, and allows for minimal delay.

Administrative Code § 26-236 (a) provides in pertinent part that, "[i]mmediately" upon receipt of a report by an officer or employee of the department that a structure or part thereof is unsafe or dangerous structurally, the Borough Superintendent of Buildings shall cause the report to be entered upon the docket of unsafe structures and premises. Section 26-237 allows for voluntary abatement of the unsafe or dangerous condition; however, it allows the person served (usually the owner or some party with a beneficial interest in the property such as a lessee, agent or executor, etc.) only 24 hours from the time of such service within which to commence the abatement of the unsafe, dangerous or detrimental condition. If the person served does not assent to undertake to abate the dangerous condition within the time allotted by section 26-237, a survey is ordered and the survey and report are then placed before the Supreme Court in accordance with section 26-238 (Administrative Code § 26-236).

The exigent nature of the circumstances which give rise to the proceeding continues through its adjudication in the Supreme Court. Administrative Code § 26-239 (b) provides that the "determination of the issue in an unsafe structure proceeding shall have precedence over every other business" of the Supreme Court Part before which it is placed. It is further provided therein that a "trial of the issue shall be held without delay". Subdivision (d) of section 26-239 provides that upon rendition of a verdict or decision finding the premises in question unsafe or dangerous structurally, etc., the Justice trying the matter "shall immediately issue a precept directed to the superintendent, reciting such verdict or decision, and com-

manding him or her forthwith to vacate and repair and secure, or * * * take down or remove the structure or part thereof * * * in accordance with such verdict". Section 26-240 (a) directs that superintendent upon receiving the precept to "immediately proceed to execute such precept, as therein directed". The 1985 precept issued in this case commands the Superintendent of Buildings to "forthwith * * * make said building safe,viz.: by vacating and taking down said building to the ground and removing the materials".

Further support for this construction of the above provisions is found in the fact that the procedure for the abatement of unsafe conditions in structures and removal of unsafe buildings has remained virtually unchanged in the City of New York since the last century. The New York City Consolidation Act of 1882, the precursor to the New York City Charters and Administrative Codes enacted in this century, contains a scheme and language virtually identical to the current procedure (*see,* NY City Consolidation Act of 1882 § 509 *et seq.* [eff 1891; *see,* Ash, New York City Consolidation Act As In Force 1891 (Weed, Parsons & Co.)]; L 1871, ch 625, § 36 *et seq.; see,* L 1885, ch 456, § 35 *et seq.).* For example, section 509 of the Consolidation Act provided: "Any building or buildings, part or parts of a building, staging or other structure in the city of New York, that from any cause may now be, or shall at any time hereafter become dangerous or unsafe, may be taken down and removed, or made safe and secure, in the manner following: Immediately upon such unsafe or dangerous building or buildings, or parts of a building, staging or structure being so reported by any of the officers of said fire department, the same shall be immediately entered upon a docket of unsafe buildings, to be kept by said superintendent; and the owner, or some one of the owners, executors, administrators, agents, lessees, or any other person or persons who may have a vested or contingent interest in same, may be served with a printed or written notice containing a description of the premises or structure deemed unsafe or dangerous, requiring the same to be made safe and secure, or removed, as the same may be deemed necessary by the said superintendent, which said notice shall require the person or persons thus served to immediately certify to the superintendent of buildings his or their assent or refusal to secure or remove the same."

Section 510 of the Consolidation Act provided that if the person or persons served with notice immediately certifies his or their assent to the securing or removal of the building, etc.,

such person or persons "shall be allowed until one o'clock P.M., of the day following the service of such notice, in which to commence the securing or removal of the same". The section provided that upon refusal or neglect to comply with any of the requirements of the notice a further notice shall be sent notifying the person or persons served that a survey of the premises named shall be made. In the case that the premises named in the notice shall be reported unsafe or dangerous by the survey then the "said report will be placed before a court therein named" for a trial on the allegations and the statements contained in the surveyors' report.

Section 511 provided for the same judicial review as provided for under the modern Code provisions. The Judge or Justice before whom the notice and report are brought was directed to immediately empanel a jury and hold a trial on the issues without adjournment except as may become necessary from day to day. Further, the section provided that "if the said verdict or decision shall find the said building, premises or structure to be unsafe or dangerous, the judge or justice trying said cause, or to whom the report of the referee trying said cause shall be presented, shall immediately issue a precept out of said court, directed to the superintendent of buildings * * * commanding him forthwith to repair and secure or take down and remove, as the case may be * * * said unsafe or dangerous building, buildings, part or parts thereof, staging, structure or other premises that shall have been named in the said report; and said superintendent shall immediately thereupon proceed to execute said precept as therein directed".

There is, however, no support found in the applicable sections of the modern Administrative Code or its historical counterpart for the defendant's argument, that the statutory scheme allows a considerable amount of time for the demolition or repair to be carried out once a precept is issued. It is unacceptable to argue that the Legislature's repeated inclusion of the words "immediately" and "forthwith" in the applicable provisions for over 100 years allows for a delay of seven years in the execution of the Code's directives regarding unsafe buildings. Furthermore, the portion of section 26-240 relied upon by the defendant City, which allows for modification of the precept by the Superintendent and an extended time period of compliance by the owner, is taken out of context. Modification of a precept by the Superintendent is allowed only after an immediate application by the person served to perform the requirements of the precept and, "when such superintendent shall be

satisfied that such change will secure the safety of such structure or premises equally well" (Administrative Code § 26-240 [a]). Before any of the provisions allowing for an extended time period for compliance with the precept is triggered, some action must be taken toward securing the safety of the structure in question.

Fundamentally, the abatement of unsafe or dangerous conditions, which constitute a threat to public health, safety and welfare, by the sealing or removal of a structure, etc., is an exercise of the municipality's police power which interferes with the beneficial use of property. It has been stated that "a municipal exercise of the police power which interferes with the beneficial use of property must be a reasonable and legitimate response to a situation which it is within the police power to correct" (*Matter of Charles v Diamond*, 41 NY2d 318, 327). Determinations of reasonableness must turn upon the facts and circumstances of particular cases (*supra*, at 327). "What is an 'unreasonable' exercise of the police power depends upon the relevant converging factors. Hence, the facts of each case must be evaluated in order to determine the private and social balance of convenience before the exercise of the power may be condemned as unreasonable" (*French Investing Co. v City of New York*, 39 NY2d 587, 596).

The legitimacy of the City's interest in protecting the public through the exercise of its power to secure or remove dangerous buildings is not being questioned in this case. The statutory scheme pursuant to which the defendant City normally operates to abate unsafe and dangerous conditions in buildings clearly provides for ample notice and an opportunity to be heard in satisfaction of the requirements of due process. However, where the provisions of the Administrative Code from which that power is drawn call for expedited action and no action is taken for seven years, no justification or reason for the delay is provided, and various proceedings to which the City was a party have transpired and affected the title to the property in question, the reasonableness of the exercise of that power can be legitimately questioned.

While there is no requirement in the Administrative Code that the party served receive any further notification beyond the issuance of the precept, it is inconceivable that, given the language of the statute and precept itself, the Legislature could have contemplated that the defendant would allow the passage of seven years between the issuance of the precept and the defendant's action pursuant thereto. Furthermore, while the

plaintiff may well indeed have failed to avail itself of various opportunities to ameliorate the unsafe conditions and the defendant may have legitimate reasons for the delay, these issues and others which may exist are properly raised and dealt with at a trial where the plaintiff bears the burden of demonstrating the lack of reasonableness of the defendant's actions. On this record and in this procedural context, we find that the allegations of the complaint as supported by the documentation submitted sufficiently allege that the defendant acted without authority pursuant to the applicable Administrative Code regulations when it executed the precept, issued seven years earlier, which contained directives commanding it to act "immediately" and "forthwith". Since the City saw fit to ignore the statutory and court mandate to proceed "forthwith", we find it appropriate to permit plaintiff to proceed to trial where it will have an opportunity to prove a cause of action for wrongful demolition.

Accordingly, the order of Supreme Court, New York County (Walter B. Tolub, J.), entered June 22, 1994, is reversed, on the law, without costs, the defendant's motion to dismiss pursuant to CPLR 3211 (a) (7) is denied and the complaint is reinstated.

SULLIVAN, J. P., ROSENBERGER, WALLACH and TOM, JJ., concur.

Order, Supreme Court, New York County, entered June 22, 1994, reversed, on the law, without costs, defendant's motion to dismiss denied and the complaint reinstated.