OPINION OF THE COURT
Paul A. Victor, J.
This is an action to recover damages for injuries sustained by a construction worker, Arthur West (now deceased), who was injured by a co-worker, while both were engaged in the demolition of a vacant residential dwelling which was owned by defendant Merline McDowell.
Plaintiffs complaint in this proceeding sets forth separate causes of action against the City of New York and McDowell, *18 and each cause of action contains allegations of common-law negligence under section 200 of the Labor Law, as well as violations of section 240 (1) and section 241 (6) of the Labor Law, which said provisions impose absolute and/or vicarious liability on “contractors, owners and their agents”, when persons employed in demolition work are injured as a result of unsafe working conditions. In a third cause of action, the plaintiff claims that the City failed to abate a nuisance and that as a result thereof West was injured.
Only the owner of the premises, Merline McDowell, who objected to demolition of the premises, and the City of New York, which hired the demolition contractor, have been named as defendants. Each defendant has cross-claimed against the other; and neither defendant has instituted a third-party proceeding against the coemployee, whose negligence contributed to the accident, or against Blandford Construction Corporation, the demolition contractor that allowed the unsafe working conditions to exist.
The proceedings, which were initially commenced in the Supreme Court in the County of Bronx, have been transferred for trial to the New York City Civil Court, County of Bronx, pursuant to CPLR 325 (d). Only the issue of liability has been presented to the trial court for a nonjury determination; and quintessential to the ultimate decision are unique issues raised under the “Unsafe Building and Property” provisions, which are contained in the Administrative Code of the City of New York, and novel aspects of the scope of the meaning of the words “contractors, and owners and their agents” as used in the Labor Law. In that regard the seminal questions raised and submitted for consideration and determination are:
(1) Should McDowell, the owner of property, who objected to and attempted to prevent the demolition of her premises, be exempt from the aforesaid provisions of the Labor Law?
(2) Should the City of New York, which hired the contractor to demolish what it perceived to be an “unsafe building”, be deemed an “owner” or a “contractor” within the meaning of the aforesaid sections of the Labor Law, and thus be held responsible for the damages sustained by the plaintiffs decedent?
(3) Should the City of New York, and the contractor it employed, be deemed trespassers because the City failed to obtain a “precept” authorizing entry upon, and demolition of, McDowell’s residence?
(4) In the event that McDowell is not found to be exempt from the aforesaid provisions of the Labor Law, should her *19 cross claim, for contribution or indemnification against the City of New York, be sustained?
(5) In the event that the City is found to be an “owner” or “contractor” or “agent”, should the City’s cross claim for contribution or indemnification against McDowell be sustained?
THE ESSENTIAL AND RELEVANT FACTUAL FINDINGS
The plaintiffs decedent, Arthur West, was injured in Bronx County on June 9th, 1987 while employed as a laborer for Blandford Construction Corporation (hereafter Blandford), a demolition contractor, which was awarded a contract by the New York City Housing Preservation and Development Department (hereinafter HPD) to demolish McDowell’s vacant, three-family residence. On that date, during the course of demolition, the decedent, who was wearing a helmet, was injured when he was struck in the head and the face by demolition debris which was thrown by a coemployee from the roof of the premises to the unguarded ground below. At the time of the accident, West was engaged in the construction of a “sidewalk bridge”, and the area where he was working was not shielded by suitable overhead protection. No evidence was introduced to demonstrate that West was contributorily negligent.
An HPD demolition inspector, who monitored the work, testified that he was present on June 8th, 1987, the date the demolition began, as well as on June 9th, 1987, the date of the accident. A report filed by him dated June 9th indicated, among other things, that Blandford’s employees were engaged, on that date, in roof demolition and the erection of a sidewalk bridge. In order to determine the measure of supervision, direction and control retained by HPD over the contractor, the plaintiff requested by subpoena that the contract be produced at the trial. Although the City was unable to provide the contract, an HPD demolition supervisor confirmed at the trial that HPD had the right and obligation to “monitor the work”; to “issue violations” for work not performed in accordance with the contract and law; and even “to stop the work”, if gross violations were observed.[1]
The defendant Merline McDowell purchased the premises in question in 1980, in its vacant and fire-damaged condition. The premises were acquired for the sum of $500 at an auction *20 conducted by the United States Department of Housing and Urban Development (hereinafter HUD), and McDowell’s residence address in the County of Queens is reflected in the deed which she received from HUD on September 26th, 1980. The deed contained a provision which made the conveyance “subject to all covenants, restrictions, reservations, easements, conditions and rights appearing of record.”
The evidence disclosed that it had been McDowell’s longstanding intention to rehabilitate the vacant dwelling as soon as she could afford the same; that from 1980 to 1986 she visited the premises one or two times per week; that this increased to three times a week in 1987 because her flaneé was living in the area; and that just three weeks prior to the demolition she had consulted with a contractor in order to obtain an estimate for its rehabilitation.
McDowell, who is still the owner of the now vacant land, confirmed that she has paid all the real estate tax bills for the premises; that said tax bills are addressed and forwarded to her at her Queens residence; that she has received and paid all citations for snow and garbage removal, which are left at the premises; and that her flaneé as well as other neighbors watched and checked on the premises when she was unable to be there. From the date of purchase until the date that plaintiff was injured, McDowell continued to reside at her Queens residence, and she never received either oral or written notice from the City or anyone else that the dwelling was found to be unsafe or a threat to life, health or safety or that the dwelling was scheduled for demolition. McDowell’s testimony, especially as to the lack of any prior actual notice, was unrefuted.
The City, however, did establish that in 1977 (three years prior to acquisition by McDowell) an emergency unsafe building proceeding was commenced against the prior owners and mortgagees, in the Supreme Court in the County of Bronx, pursuant to chapter 26, title C, part I, article 8 of the Administrative Code. Although the Administrative Code required the filing of a notice of pendency of an action,[2] the City did not introduce any evidence that such a notice was ever filed. In the unsafe building proceeding, which was brought against the prior owners (Francisco Roldan, Carmen Roldan and Cristobal Baerga) and against the prior mortgagees (Federal National Mortgage Association and Manuel Samalot), *21 the City sought, among other things, a decision from a Justice of the Supreme Court declaring the premises in question “unsafe”, and requiring that the premises “be made safe or be demolished.” In addition, in accordance with chapter 26, title C, part I, article 8 of the Administrative Code and in order to implement said decision, the City sought the judicial issuance of a “precept to abate”. The entire record of those emergency proceedings was offered and received in evidence.[3] An examination of that record revealed that the owner and other persons named, although duly served, did not appear; and that said proceedings culminated in a decision, dated November 22, 1977, in which the presiding Justice made written “findings” in which he declared that this vacant multiple dwelling was “unsafe and dangerous”, and in which he held, “as a matter of law,” that: “[I]n accordance with the provisions of chapter 929 of the laws of 1937, and the New York City Administrative Code, a precept should issue out [of] the said Supreme Court of the State of New York, directed to the Superintendent of Buildings for the borough of Bronx, in the City of New York, commanding him forthwith to make said premises safe, to wit by vacating and taking down said building to the ground and removing materials.” (Emphasis added.)
The aforesaid file does not contain any evidence, and none was offered by the City, to demonstrate that any such “precept” was ever issued by the court. In addition, no evidence was introduced to show that the decision or the pendency of the proceeding was ever brought to the attention of the present owner McDowell, or to the attention of her predecessor in interest HUD. It is clear, however, that, after the above decision was rendered in November of 1977, the City took no action with reference to the property for almost 10 years; and that no notice was ever provided to McDowell by the City that a life, health or safety hazard existed and should be abated, or that a demolition was being considered.
The only “notice” ever received by McDowell was on June 9th, 1987, the date of the accident, when she received a call from a neighbor, who lived across the street from the subject premises. He informed her that three or four men were on her property and preparing to “tear down the building.” Upon arrival at the premises McDowell angrily confronted the individuals present and ordered them to desist and leave the property since they had no permission from her to be there or to demol *22 ish the building. She was informed by one of the men who appeared to be in charge that “his boss was the City of New York”; that he was “employed by the City of New York”; that he was there to demolish the building and that she should get off the property and take up the problem with the City. When the demolition crew, and other persons present, refused to desist and leave her premises, McDowell proceeded to the Building Department in Bronx County and was there informed by a clerk that a demolition order “was on file,” and that she has “no rights.” She was never provided with a copy of the alleged demolition “order”, and no such document was ever offered into evidence by the City of New York.
APPLICABLE LAW AND DISCUSSION
I. Administrative Code of the City of New York: Unsafe Buildings and Property
A. Background
The law, which allows the City of New York to exercise its police powers to abate unsafe conditions, has remained virtually unchanged for more than 100 years. (See, L 1871, ch 625, § 36 et seq.; NY City Consolidation Act of 1882 [L 1882, ch 410] § 509 et seq.; L 1885, ch 456, § 35 et seq.; L 1937, ch 929; former Administrative Code § C26-80.0 et seq.; L 1985, ch 907; Administrative Code § 26-235 et seq.; 51 St. Nicholas Realty Corp. v City of New York, 218 AD2d 343 [1st Dept 1996].) Thus, the Administrative Code provisions, which were applicable when the unsafe building proceeding herein was initially commenced in 1977, were virtually identical to the Administrative Code provisions applicable in 1987, when plaintiff was injured during the demolition of McDowell’s premises. (Compare above-stated former Administrative Code § C26-80.0 et seq., with Administrative Code § 26-235 et seq.)
These Administrative Code provisions, which are summarized below, allow the City, within the confines of due process, to legally interfere with the beneficial ownership of property in order to protect the public from dangerous conditions. These statutory emergency police powers, and the Administrative Code provisions which implement them, are hot being questioned in these proceedings. What has been questioned, however, is: (i) the failure of the City to provide the current owner McDowell with any notice and opportunity to be heard; (ii) the delay in the execution of the demolition procedure; and *23 (iii) the failure of the City to otherwise comply with the demolition procedure set forth in the Administrative Code.
B. The Unsafe Building Procedure
Section 26-23G[4] of the Administrative Code provides that upon receipt of a report by the Superintendent of Buildings that any structure is unsafe or dangerous, the Superintendent is commanded to “immediately” cause the report to be entered upon a docket of unsafe structures and to serve a notice upon the owner or any person who may have a vested or contingent interest in said premises. The Administrative Code provides for the “[v]oluntary abatement of unsafe or dangerous conditions” by the owner or other interested person provided that said owner or person “immediately’ consents to said abatement and commences to do so within 24 hours of being served with a notice. (Administrative Code § 26-237.) In the event of noncompliance by the owner, sections 26-236 and 26-238 command that a survey of the premises be obtained, that a copy of the report of the survey be “immediately” posted on the premises and brought before a Supreme Court Justice for a trial upon the allegations and statements made in said report and survey.
Section 26-239 sets forth the procedure for judicial review and provides that such a proceeding “shall have precedence over every other business of such supreme court” (Administrative Code § 26-239 [b] [emphasis added]); that “[a] trial of the issue shall be held without delay” (Administrative Code § 26-239 [b] [emphasis added]); and that upon rendition of a verdict or decision, the Justice “shall immediately issue a precept directed to the superintendent, reciting such verdict or decision, and commanding him or her forthwith to vacate and repair and secure, or to repair and secure, or take down or remove the structure * * * in accordance with such verdict or decision” (Administrative Code § 26-239 [d] [emphasis added]).
Section 26-240 (a) of the Administrative Code mandates that: “[u]pon receiving a precept * * * the superintendent * * * shall immediately proceed to execute such precept, as therein directed * * * [and] [w]henever the demolition of any structure * * * is to be carried out pursuant to any such precept * * * such demolition work * * * shall be performed by or under the direction of the commissioner of general services * * * or by the com *24 missioner of the department of housing preservation and development” (emphasis added). Section 26-240 also allows the owner of the premises to perform the requirements of the precept and/or to seek a modification of its provisions.[5]
C. Wrongful Delay and Unauthorized Demolition
At trial, the City did not introduce any “precept” or other court order which authorized the demolition of McDowell’s dwelling, but argued instead that the aforesaid 1977 “decision” provided the authority to demolish the building in 1987. The City argued further that McDowell was on “constructive” notice of said decision because she received a deed in 1980 “subject to all covenants, restrictions, reservations, easements, conditions and rights appearing of record”. The City thus suggested that since demolition was “lawfully” accomplished in accordance with said decision, and since McDowell was on constructive notice that said demolition was authorized and eminent, that McDowell, as the owner of the premises, should somehow be held solely responsible for the activities of the demolition contractor.
Apart from the fact that McDowell received no notice, constructive or otherwise,[6] this argument fails because West’s injuries were caused, not by the unsafe condition of McDowell’s premises, but by the unsafe working conditions created by Blandford, which was hired, not by McDowell, but by the City!
In any event, the City never established that said demolition was lawfully authorized in accordance with a judicially issued precept. A precept, which is a mandate of the court and the equivalent of a court order,[7] must be reduced to a writing and signed by the Justice who made it in order to be enforceable. (Administrative Code § 26-239 [d]; CPLR 2219; Parsons v Parsons, 82 Misc 2d 454; see also, Carter v Castle Elec. Contr. Co., 23 AD2d 768; Le Glaire v New York Life Ins. Co., 5 AD2d 171.) The law also requires that such orders and mandates be entered and filed in the office of the clerk of the court where *25 the action has been tried (CPLR 2220); that the execution of. such be performed “immediately * * * as therein directed” (Administrative Code § 26-240 [a] [emphasis added]); and that “[u]pon compliance with any precept issued to him * * * the superintendent shall make return thereof * * * to the justice then holding the special term of the court from which such precept issued” (Administrative Code § 26-242 [emphasis added]).
In the proceedings before the court, no evidence was introduced to demonstrate that such precept (if it had been issued) was ever entered or docketed. Certainly, if a precept had issued, the City did not comply with the mandate that it be executed “immediately’, and that a “return thereof’ be made to the issuing Justice. Moreover, no circumstances have been presented by the City herein to justify the exceedingly inordinate delay in the execution of such a precept, had it been issued. It is noted that the Administrative Code expressly calls for, and commands, expedited action at every step of the process. Even if a precept had been issued by the Justice before whom the unsafe building procedure was pending, the City’s 10 years of delay in its execution, under the circumstances presented, may also support a conclusion that the demolition was unwarranted and unlawful. (See, 51 St. Nicholas Realty Corp. v City of New York, 218 AD2d 343 [1st Dept 1996], supra.) As noted by the Appellate Division:
“[W]here the provisions of the Administrative Code from which that power is drawn call for expedited action and no action is taken for seven years, no justification or reason for the delay is provided, and various proceedings to which the City was a party have transpired and affected the title to the property in question, the reasonableness of the exercise of that power can be legitimately questioned.
“While there is no requirement in the Administrative Code that the party served receive any further notification beyond the issuance of the precept, it is inconceivable that, given the language of the statute and precept itself, the Legislature could have contemplated that the defendant would allow the passage of seven years between the issuance of the precept and the defendant’s action pursuant thereto.” (51 St. Nicholas Realty Corp. v City of New York, 218 AD2d 343, 351, supra.)
The City was certainly on notice of the existence of a new owner of the premises, not only from her deed which was duly recorded, but also from the annual real estate taxes which were forwarded to McDowell and paid by her every year since *26 1980. The City certainly had ample opportunity to notify McDowell, or even to join her as a party to the pending action[8] before proceeding to demolish the premises.
Having had no notice that such a proceeding was pending, or that the City had scheduled her premises for demolition, McDowell was precluded from any opportunity to intervene in the proceeding or to seek modification of the precept (had one been issued) and/or otherwise avail herself of other procedures either to secure and safeguard the premises and avoid demolition, or to perform the requirements of the precept at her own cost but in a manner which would not subject her to liability for unsafe working conditions.
The court is thus constrained to conclude that the demolition of McDowell’s dwelling was unauthorized and unlawful and that the City of New York and its demolition contractor were trespassers on McDowell’s property. As a trespasser, the City must be held accountable for all the consequences of the intrusion regardless of whether the City could have or should have seen the ultimate consequences of the trespass and regardless of whether the City’s conduct would have subjected the City to liability had the City not been a trespasser. (Van Alstyne v Rochester Tel. Corp., 163 Misc 258; State of New York v Fermenta ASC Corp., 166 Misc 2d 524, 536; Restatement [Second] of Torts § 162; Prosser and Keeton, Torts § 13, at 75-77 [5th ed].)
II. New York State Labor Law
In this proceeding the plaintiffs complaint sets forth causes of action against the defendants alleging, inter alia, common-law negligence and violations of sections 200, 240 (1) and section 241 (6) of the Labor Law as well as violations of rule 23 of the Industrial Code (12 NYCRR part 23), which implements the provisions of Labor Law § 241 (6).
A. Section 200 of the Labor Law and the Common Law
Section 200 (1) of the Labor Law provides in part that: “All places to which this chapter applies shall be so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection to the lives, health and safety of all persons employed therein or lawfully frequenting such places.” (Emphasis added.)
*27 It is axiomatic that this provision is a codification of the common-law duty of property owners, contractors and other employers to provide employees, and other persons lawfully on the premises, with a safe place to assemble and work. (Jock v Fien, 80 NY2d 965; Lombardi v Stout, 80 NY2d 290, 294; Mordkofsky v V.C.V. Dev. Corp., 76 NY2d 573, 577; Allen v Cloutier Constr. Corp., 44 NY2d 290, 299.) Equally well established is the principle that claims under this provision are not sustainable unless the party charged had the authority to control, or exercised some supervision or control over the activity bringing about the injury (Rizzuto v Wenger Contr. Co., 91 NY2d 343, 352; Ross v Curtis-Palmer Hydro-Elec. Co., 81 NY2d 494, 505; Allen v Cloutier Constr. Corp., supra, at 299; Gonzalez v United Parcel Serv., 249 AD2d 210).
As stated in Ross and Allen (supra), “[t]his rule is an outgrowth of the basic common-law principle that ‘an owner or general contractor [sbjould not be held responsible for the negligent acts of others over whom [the owner or general contractor] had no direction or control’ ” (Ross v Curtis-Palmer Hydro-Elec. Co., at 505, quoting Allen v Cloutier Constr. Corp., at 299).
It is abundantly clear, in the case at bar, that the owner, McDowell, did not engage in even a scintilla of supervision or control over the activity of the demolition contractor. Moreover, she was denied any right to do so and even ordered to leave her own premises by the City and its agent. The court concludes, therefore, that McDowell cannot be held responsible for West’s injuries under the common law or pursuant to section 200 of the Labor Law. The City, however, clearly had supervision and control, as well as a statutory duty to have said work “performed by or under the direction of [its Commissioners]”. (Administrative Code § 26-240 [a].) An HPD demolition supervisor confirmed that the City had the right and obligation to “monitor the work”, “to issue violations,” and even to “stop the work”. Moreover, pursuant to that right and obligation, an HPD inspector was at the scene during the demolition and his report for the date of the accident included his observations that roof demolition and the erection of a sidewalk bridge were taking place. The totality of evidence and circumstances compel the conclusion that roof demolition was being negligently performed by or under the City’s direction and control. Since the City had the obligation and authority to direct and/or control this activity, and to prevent or correct the hazardous working condition, and negligently failed to do so, *28 the court concludes that the City must be held liable under the cause of action which alleges common-law negligence and a violation of section 200 of the Labor Law.
B. Section 240 (1) of the Labor Law
Subdivision (1) of section 240 of the Labor Law provides that: “All contractors and owners and their agents, except owners of one and two-family dwellings who contract for but do not direct or control the work, in the erection [or] demolition * * * of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.” (Emphasis added.)
Section 240 (1) was specifically designed to protect workers, such as West, from the type of injury which he sustáined, i.e., those “typically associated with elevation-related hazards.” (Ross v Curtis-Palmer Hydro-Elec. Co., 81 NY2d, supra, at 500; Rocovich v Consolidated Edison Co., 78 NY2d 509, 514.) In addition a review of the legislative history reveals that section 240 (1) and section 241 (6) of the Labor Law were amended in 1969 for the express purpose of placing “ultimate responsibility for safety practices * * * where such responsibility actually belongs, on the owner and general contractor” (1969 NY Legis Ann, at 407; Gordon v Eastern Ry. Supply, 82 NY2d 555, 560). Thus, these statutory mandates impose a nondelegable duty on the contractors, owners and their agents to make certain that these safety practices are complied with. Elevation-related occupational hazards which are found to be the proximate cause of, or a substantial factor in bringing about a worker’s injury, result in the imposition of “absolute” liability, and contributory negligence and comparative negligence cannot be asserted as defenses to such a claim. (Rizzuto v Wenger Contr. Co., 91 NY2d 343, supra; Long v Forest-Fehlhaber, 55 NY2d 154.)
In arriving at a determination as to the hazards covered and the persons responsible therefor, the court is cautioned to construe this absolute liability provision “1 “as liberally as may be for the accomplishment of the purpose for which it was thus framed”.’ ” (Rocovich v Consolidated Edison Co., 78 NY2d, supra, at 513; Ross v Curtis-Palmer Hydro-Elec. Co., 81 NY2d, supra, at 500; Gordon v Eastern Ry. Supply, 82 NY2d, supra, at 559.)
Although the scope and meaning of the term “owner” has not been defined or otherwise delineated by the Legislature, prior *29 attempts to carve out exceptions, or to narrow that term to include only those parties with a property interest who hire the general contractor or supervise the work, have been uniformly rejected. (Celestine v City of New York, 59 NY2d 938; Sperber v Penn Cent. Corp., 150 AD2d 356; Kerr v Rochester Gas & Elec. Corp., 113 AD2d 412; Copertino v Ward, 100 AD2d 565.) Since Celestine, fee owners, and other persons not owners, have consistently been held liable pursuant to section 240 (1) of the Labor Law, despite the fact that they did not hire the contractors or supervise the work. In Celestine and its progeny, the Court of Appeals established a “bright-line rule” that sought to impose absolute liability under section 240 (1) on all “owners”. For example, in a subsequent case, that Court emphatically explained that “ ‘[1] lability rests upon the fact of ownership and whether [the owner] had contracted for the work or benefitted from it are legally irrelevant.’ ” (Coleman v City of New York, 91 NY2d 821, 822; Gordon v Eastern Ry. Supply, 82 NY2d 555, 560, supra.) In addition, since the “bright-line” principles enunciated in Celestine and Coleman (supra), not only have fee owners consistently been held to be responsible, the term “owner” has even been expanded to include those, who although not fee owners, either had some interest in or exercised some control over the property. (See, for example, DeFreece v Penny Bag, 137 AD2d 744 [2d Dept 1988] [contract vendee held to be an owner because he was provided with access and contracted to have repairs made]; Vigliotti v Executive Land Corp., 186 AD2d 646 [2d Dept 1992] [a transfer of title to an industrial development agency was not sufficient to divest the former owner of responsibility, and both former owner and a contract vendee were each deemed owners within the meaning of the statute]; Sperber v Penn Cent. Corp., 150 AD2d 356 [2d Dept 1989] [both the Penn Central Corp. (the former owner), and its wholly owned subsidiary corporation (the present owner), neither of which had any access to the property, were each deemed as owners under the statute because Penn Central Corp. had, some years before, leased the property to the Metropolitan Transportation Authority for 60 years]; Collins v County of Monroe Indus. Dev. Agency, 167 AD2d 914 [4th Dept 1990] [the prior fee owner, which had no responsibility for repairs and which had conveyed title to a development agency and had granted a permanent easement to the City to build a garage, was still deemed an “owner” because it had obtained a lease to operate the garage].)
Based upon the above principles, the court concludes that the City was an “owner” within the meaning of subdivision (1) *30 of section 240 of the Labor Law. Having arrogated to itself the mantle of ownership, having “exercised some control over the property” and having hired Blandford to demolish McDowell’s premises, the City should not now be permitted to divorce itself from the obligations which ordinarily accompany such rights and privileges of ownership. Moreover, the City also qualifies as a general contractor since it not only hired the contractor but also retained the right to have said demolition performed by or under its direction and control.
The issue as to McDowell is exceedingly more complex because the statute, which has been amended[9] to provide an express exemption for owners of one- and two-family dwellings, does not provide, or even suggest, any exemption for a fee owner in McDowell’s circumstances. However, this court must be motivated by “ ‘notions of reasonableness and fairness’ ”. (See, Khela v Neiger, 85 NY2d 333, 337; Cannon v Putnam, 76 NY2d 644; Webb v 444 Cent. Park Owners, 248 AD2d 175.) This court is not unmindful of the numerous precedents which call for a “bright-line” strict application of this absolute liability statute as to fee owners, but this court cannot blind itself to the fact that McDowell was deprived of the rights and privileges of such ownership. Not only was she denied any voice, or even a reasonable opportunity to seek a modification or judicial intervention, she was even summarily evicted from her own premises and advised that she had “no rights”. It could not have been within the contemplation of the Legislature to impose a nondelegable duty upon a fee owner, who not only did not delegate any such demolition rights, but even objected to and attempted to prevent the demolition. In a similar, but less egregious situation, the Appellate Division, First Department, held that a residential cooperative which had an “antagonistic” relationship with the sponsor, could not be held liable as an “owner” under section 240 (1) for the death of a laborer during the renovation of an apartment because the decedent was hired by and for the benefit of the sponsor, and the sponsor was not acting as the cooperative’s agent. (See, Webb v 444 Cent. Park Owners, 248 AD2d 175, supra.)
In the Khela and Cannon cases (supra), the scope and reach of the statutory “one and two-family dwelling exemption” were considered by the New York Court of Appeals. In Cannon the exemption was held to apply even though the construction related to property which had both a residential and commercial *31 purpose, because the work was unrelated to the commercial portions of the premises. In Khela the Court granted the exemption despite the fact that it involved a three-family dwelling, because it was being converted to a two-family dwelling.
In support of these judicial exemptions, the Court of Appeals stated: “The determination whether the exemption is available to an owner in a particular case turns on the site and purpose of the work (Cannon v Putnam, 76 NY2d, at 650). In formulating this test, the Court was mindful of the ‘underlying notions of reasonableness and fairness that motivated the Legislature’s adoption of the dwelling-owner exemption.’ ” (Khela v Neiger, 85 NY2d, supra, at 337.)
The court thus concludes that fairness and reasonableness mandate that McDowell be exempt from the provisions of section 240 (1) of the Labor Law, and that any decision to the contrary would be shocking to the conscience of the court. In any event, even if not exempt, McDowell would be entitled to full indemnification from the City under the circumstances presented (Baker v Barron’s Educ. Serv. Corp., 248 AD2d 655; see also, Chapel v Mitchell, 84 NY2d 345, 347).
C. Section 241 (6) of the Labor Law
Subdivision (6) of section 241 of the Labor Law, which also provides an exemption for owners of one- and two-family dwellings, requires all other contractors, owners and their agents “to provide reasonable and adequate protection and safety to the persons employed [in construction and demolition.]” This mandate, which is also a reiteration of the common law, is identical to the standard set forth in section 200 of the Labor Law. Therefore, no “absolute” liability is provided for a violation of this standard of care. However, section 241 (6) also requires contractors, owners and their agents to abide by specific safety rules which are incorporated in rule 23 of the Industrial Code (12 NYCRR part 23) and which have been promulgated by the Commissioner of the Department of Labor in order to implement the mandate of section 241 (6). The rules, which plaintiff claims have been violated by defendants, include the following:
“23-1.7 Protection from general hazards.
“{a) Overhead hazards. (1) Every place where persons are required to work or pass that is normally exposed to falling material or objects shall be provided with suitable overhead protection.” (12 NYCRR 23-1.7 [underscoring added].)
*32 “23-2.1 Maintenance and housekeeping * * *
“(b) Disposal of debris. Debris shall be handled and disposed of by methods that will not endanger any person employed in the area of such disposal or any person lawfully frequenting such area.” (12 NYCRR 23-2.1.)
“23-3.3 Demolition by hand * * *
“(e) Methods of operation. Where the demolition of any building or other structure is being performed by hand, debris, bricks and any other materials shall be removed as follows:
“(1) By means of chutes constructed and installed in compliance with this Part (rule);
“(2) By means of buckets or hoists; or
“(3) Through openings in the floors of the building or other structure in compliance with this section.” (12 NYCRR 23-3.3.)
Although the aforesaid provisions of the Industrial Code also impose “nondelegable” obligations upon contractors, owners and their agents, and although they may be held vicariously liable for the negligent acts of others, violations of these Code provisions do not result in “absolute liability”. In order to impose liability the violation must also be accompanied by a negligent act of another which caused the injury. (Rizzuto v Wenger Contr. Co., 91 NY2d, supra, at 348-350.) The Rizzuto Court explained that a violation of an Industrial Code regulation is merely “some evidence of negligence”, and it reconciled the nuances of section 241 (6) and the Code as follows:
“[A]lthough this Court has consistently rejected the notion that a violation of section 241 (6) results in absolute liability irrespective of the absence of some negligent act which caused the injury, we have repeatedly recognized that section 241 (6) imposes a nondelegable duty upon an owner or general contractor to respond in damages for injuries sustained due to another party's negligence in failing to conduct their construction, demolition or excavation operations so as to provide for the reasonable and adequate protection of the persons employed therein. Thus, once it has been alleged that a concrete specification of the Code has been violated, it is for the jury to determine whether the negligence of some party to, or participant in, the construction project caused plaintiffs injury. If proven, the general contractor (or owner, as the case may be) is vicariously liable without regard to his or her fault [citations omitted].
“An owner or general contractor may, of course, raise any valid defense to the imposition of vicarious liability under section 241 (6), including contributory and comparative negligence *33 [citations omitted]” (Rizzuto v Wenger Contr. Co., supra, 91 NY2d, at 349-350).
The court concludes, therefore, that plaintiffs decedent, West, was injured as a result of the negligence of a coemployee as well as by the failure of the City and Blandford to enforce and comply with the above-quoted provisions of rule 23 of the Industrial Code.
The court also concludes, for all the reasons heretofore stated, that the City is liable for these operations both as an “owner” and/or as a “general contractor”, within the meaning of the statute. As with section 240 (1), the court holds that McDowell is exempt from the provisions of section 241 (6) and/or is entitled to full indemnification from the City for all damages sustained by plaintiff.
The court further finds and concludes that the decedent West was not guilty of any conduct or negligence which contributed to the happening of the accident.
III. Nuisance
In a separate cause of action the plaintiff alleges that West was injured as the result of the City’s failure to abate a nuisance, and plaintiff thereby seeks a verdict and judgment against the City for the damages sustained by West. This cause of action fails since the plaintiff did not, and cannot, prove that the failure of the City to timely abate the nuisance was the proximate cause of West’s injuries. The court has found and determined that unsafe working conditions, Code violations, and the negligence of a co-worker were the proximate cause of the accident, not the vacant fire-damaged condition of the premises.
JUDGMENT OF THE COURT
The court therefore renders judgment as follows: (1) for the plaintiff, and against the defendant, the City of New York, on the first cause of action; (2) for the defendant, Merline McDowell, and against the plaintiff on the second cause of action; (3) for the defendant, City of New York, and against the plaintiff on the third cause of action; and (4) for the defendant McDowell and against the defendant, the City of New York, on the cross claims.

. The Administrative Code also required the City to have said demolition work performed “by or under the direction of [its commissioners] (See, Administrative Code § 26-240 [a].)

. (Administrative Code § 26-242.) CPLR 6513 provides that a notice of pendency shall be effective for a period of three years from the date of filing.

. See, In re New York City v Unsafe Bldg. & Structure No. 1915 Crotona Ave., Sup Ct, Bronx County, index No. 2671/1977.

. All such references are to those sections of the Administrative Code which were applicable in 1987, each of which has an identical predecessor in the Administrative Code provisions applicable in 1977.

. Section 26-240 (a) states that: “[t]he owner of such structure * * * or any party interested therein * * * shall be allowed to perform the requirements of the precept * * * [and] [t]he superintendent shall have authority to modify the requirements of any precept upon application to him or her in writing by the owner of such structure” (emphasis added).

. No proof was offered by the City to establish any notice “appearing of record”.

. See, Black’s Law Dictionary (1176 [6th ed 1991]), which defines a precept as “[a]n order, writ, warrant, or process” including “[a]n order in writing, sent out by a justice of the peace or other like officer”.

. See, e.g., RPAPL 841, dealing with joinder of new owners in actions to abate a nuisance.

. L 1980, ch 670.